der the appropriations made for the Redwood National Park pursuant to Public Law 90–545, 9th Congress, 2d Session, approved October 2, 1968.

(2) It is further ordered that judgment be and the same is hereby entered in favor of A. E. Miller, trustee for G. F. Forester, Verda Forester Williams and C. M. Rocca, Jr., and also to C. M. Rocca, Sr., and the Bank of America National Trust and Savings Association, as their interest may appear, for the taking of parcels 03–142 and 03–143 in the sum of $57,570 plus interest at the rate of 6 percent per annum from October 2, 1968, until paid, such payments, as hereinbefore mentioned to be made by defendant from moneys presently available from the appropriations made for the Redwood National Park, pursuant to Public Law 90–545, 90th Congress, 2d Session, approved October 2, 1968.

(3) It is further ordered that judgment be and the same is hereby entered denying recovery of litigation expenses by the plaintiffs.

**IOWA STATE UNIVERSITY OF SCIENCE AND TECH-NOLOGY**

v.

**The UNITED STATES.**

No. 413–69.

United States Court of Claims.
July 19, 1974.

**510**

Charles T. Akre, Washington, D. C., attorney of record, for plaintiff. Marion Hirschburg, Ames, Iowa, Clarence T. Kipps, Jr., James F. Gordy, Robert D. Heyde, and Miller & Chevalier, Washington D. C., of counsel.

Jane C. Bergner, Washington, D. C., with whom was Asst. Atty. Gen. Scott P. Crampton, for defendant. Gilbert E. Andrews and Joseph Kovner, Washington D. C., of counsel.

Before SKELTON, NICHOLS, and KASHIWA, Judges.

## OPINION

PER CURIAM: *

In this case, Iowa State University of Science and Technology, as plaintiff, seeks to recover a total of $496,280.36, plus interest allowed by law, which was assessed and paid on the income of its wholly owned television station WOI–TV for fiscal years ended June 30, 1962, 1963, 1964, and 1965. The central issues in the case are whether the income in question constituted unrelated business income and, if so, whether expenses derived from the operation of the two university radio stations, WOI–AM and WOI–FM, may be deducted as ordinary and necessary expenses of that business. For the reasons stated below, we hold that WOI–TV constituted an unrelated business within the meaning of § 513 of the Internal Revenue Code of 1954 and that the expenses generated by the operation of the two radio stations were not deductible expenses of that business within the meaning of §§ 512 and 162. Plaintiff's petition must, therefore, be dismissed.

Iowa State University (hereinafter frequently referred to as "Iowa State" or simply as "the University") is a fully accredited institution of higher learning. It is governed by the Iowa State Board of Regents and emphasizes various fields in science and technology. In addition to its instructional functions, Iowa State operates a substantial extension program and participates in numerous research projects for the Federal Government and others. The University owns and operates the three communications facilities here in issue. The first electronic communications activity on campus began in 1914 with the construction of an experimental radio transmitter by the Electrical Engineering Department. In 1921, voice transmissions of weather and crop reports began, and were followed shortly thereafter by the addition of musical broadcasts, educational talks, and book reviews.

In the late 1930's, a few experimental television stations were being licensed by the Federal Communications Commission (FCC). Applications for construction permits for an FM radio facility and a television station were filed by Iowa State in 1944 and 1945, respectively, and both were approved by the FCC. WOI–FM began transmission in 1949,

---

* This opinion incorporates the greater part of the opinion prepared by Trial Judge Lloyd Fletcher, with modifications and additions by the judges.

WOI–TV in 1950. During the interval between the grant of the television station construction permit and the initial broadcast, the FCC ordered a stay, or "freeze", on all new permit applications, leaving 36 stations then operating as well as 70 stations which were allowed to proceed with construction. Iowa State was then the only holder of an approved construction permit in central Iowa and, consequently, the only station licensed in the area during the period of the freeze. Representatives of four television networks requested affiliation with the station even before broadcasts began, and the State Board approved the negotiation of contracts under which WOI–TV would receive compensation for the broadcast of network programming.

In 1952, the *Sixth Report and Order* of the FCC ended the freeze and allocated three VHF commercial channels to central Iowa. By May of 1955, NBC and CBS had become affiliated with two Des Moines stations, WHO and KRNT, respectively, and the DuMont network was no longer in existence. The ABC network affiliation was retained by WOI–TV.

The *Sixth Report and Order* also created a system of licensing for television stations, and classified the stations according to ownership. A commercial station could be licensed to either profit or nonprofit groups; on the other hand a noncommercial station could be licensed only to a nonprofit owner. Approximately 10 percent of the allocated stations were reserved for noncommercial stations with the expectation that such stations would be licensed mainly to educational institutions and similar groups which presumably would use the stations as vehicles for the presentation of educational programming. Advertising on noncommercial stations was prohibited because of concern that commercial stations might increase commercially to the detriment of educational and public interest programming. However, the content of programs presented by either class of station was not regulated, and hence, on occasion, program content might well be identical under both types of ownership.

WOI–TV has operated under a commercial license since 1952. Iowa State has produced, however, evidence of a variety of functions in order to illustrate that the station, in both its programming and its other activities, was operated during the years at issue in keeping with the educational goals of the University by participating in both the instruction and training of individuals as well as the dissemination of information to the public. The activities of WOI–TV which would be encompassed by these two types of activities included participation in the Iowa Joint Committee on Educational Television (IJCET) and the resulting in-school classroom broadcasts, extension programming, closed circuit work, and participation in the training of students for careers in the television industry.

As early as 1949, Iowa State had begun consideration of the use of television as a method of classroom teaching. In 1952, IJCET was formed to investigage the feasibility of a state-wide system of educational television. The Committee was then comprised of representatives of the three Iowa institutions of higher learning and the Department of Public Instruction. WOI–TV staff members served as part of Iowa State's representation with full voting powers. The IJCET budget was approved by the State Board of Regents and funds were provided by the four participants, with Iowa State providing 20 percent of the total costs.[1] Early attempts by IJCET to secure legislative support for the creation of a state-wide educational television network including WOI–TV failed.[2]

---

1. As to the remaining 80 percent, the Department of Public Instruction provided 50 percent, the University of Iowa 20 percent, and Iowa State Teachers College 10 percent.

2. It was not until 1967 that a state-wide system was created, and educational station KDPS, owned and operated by the Des Moines Independent School District, became the local participant.

In 1952, IJCET and WOI–AM–FM–TV coordinated the development and presentation of in-school television instruction. The series, entitled "Iowa TV Schooltime", consisted of daily half-hour programs broadcast during the school year and dealing with Iowa history, science, art, and politics. Content and teachers were selected by IJCET and programs were initially produced in the WOI studios for live broadcasts. By 1956, programs were recorded on kinescopes and made available without cost to other stations throughout the year.[3] By 1965, instructional programs were being collected in regional libraries for general dissemination, and WOI–TV supplemented its own programming with films from the Great Plains Library in Lincoln, Nebraska. An additional instructional program in various levels of Spanish was broadcast during at least part of the period in issue.

WOI–TV also broadcast programs prepared by the University Extension Service as a part of its dissemination activity. Extension work began at the University in 1870 and is currently headquartered on campus with two extension workers in agriculture and home economics located in every county of the state. Television broadcasts as a means of disseminating extension information dates from 1950, when the first program broadcast on WOI–TV was produced by an agricultural specialist on the faculty of Iowa State. Regular broadcasts in agriculture and home economics began in 1951 and 1952, respectively. The major efforts of extension programming are directed towards providing market news for WOI radio and are aimed at day-to-day market conditions. Television presentations are aimed at trend analysis.

Each week during the years in issue, the Extension Service prepared for daily broadcast on WOI–AM six 4-minute features on agriculture and two 6-minute programs on economic outlook and re-search, as well as two similar daily home economics programs, which were all taped and distributed to radio stations throughout the state. In addition, the Extension Service provided a regular 45-minute "Farm Facts" program for daily broadcast which included farm news, market information, educational features, and music. Television programming by the Extension Service included a weekday 30-minute noon farm report which presented news, weather, crop reports, daily feature, and 6 minutes of prices and trends. Other television programming included two 6-minute home economics features daily and a 29-minute market feature broadcast on Saturday. The latter was reproduced for use on 15 other stations in the midwest. Occasionally, WOI–TV facilities were used for the production of tapes to be used by other broadcasters throughout the state. The Extension Service was billed through intramural forms for services provided in amounts less than the costs of production. On occasion, the Extension Service produced programs at other stations. Three members of the Extension Service were program specialists who worked primarily in radio and television.

Regular closed circuit telecasts to Iowa State classrooms began in 1961 and were developed by various instructors in cooperation with WOI–TV regular staff members. All recording equipment and coaxial cable was installed and maintained by WOI–TV. Classroom monitors were acquired by the several departments involved. Although no charge was made for the production of these programs, departments utilizing the facilities were billed through intramural billing forms for use of the videotape heads at $2.25 per half-hour of playbacks. Approximately $60,000 in equipment used solely for closed circuit work was invested by WOI–TV during the years in issue.

---

3. Three stations in the Cedar Rapids-Waterloo area used the programs for the years 1962–63 to 1964–65. A station in Mason City used the programs for the 1964–65 year.

No course was offered totally through closed circuit broadcasts; this method of instruction was a supplement to regular classroom activities. For example, two mathematics courses used closed circuit television for approximately half of scheduled class time. The Engineering Graphics tapes were replayed approximately four times per quarter. A summary of the closed circuit broadcasts is as follows:

| Year | Courses | Enrollments | Total |
|------|---------|-------------|-------|
| 1961–62.. | Mathematics 101, 102 .... | 1,600 | 1,600 |
| 1962–63.. | Mathematics 101, 102 .... | 1,720 | 1,720 |
| 1963–64.. | Mathematics 101, 102 .... | 2,010 | ...... |
| | Eng. Graph 131, 132 ..... | 1,100 | 3,110 |
| 1964–65.. | Mathematics 101, 102 .... | 2,430 | ...... |
| | Eng. Graph 131, 132 ..... | 1,320 | ...... |
| | Vet. Anatomy ......... | 90 | 3,840 |
| Total | ........................... | | 10,270 |

WOI–TV also aided the University in its preparation of students for careers in the television broadcasting industry by staff participation in presenting broadcasting courses and by employing students at the studio in various capacities on a part-time basis. For the period in issue, there were a minimum of 21 courses in radio and television offered by the University each year with an average of 78 students per course. The majority of these courses were in the departments of telecommunicative arts and technical journalism, with one course each offered by the English, Music, and Electrical Engineering Departments.

Approximately 10 courses offered by the Telecommunicative Arts Department used the facilities of WOI–TV to some extent. The subject matter of these courses included introductory materials, production and direction work in closed circuit, and broadcast speaking. In one advanced course, 400B, students wrote, directed and produced a half-hour program for broadcast on WOI–TV each Sunday morning. These programs were produced in the WOI–TV studios using the studio facilities and some staff members. The series began in 1965 with 18 weeks of programming. Professionals from several local stations, including WOI–TV and educational station KDPS, frequently acted as guest lecturers in the various courses. The Exhibit Hall and its broadcast facilities were turned over to the department for the use of students when the station moved to its new physical plant in 1964.

WOI–TV was used by the Telecommunicative Arts Department as a working example of a commercial television station. Although other local stations were visited and used for instruction, the proximity of the WOI–TV facilities provided an opportunity for regular exposure to the operations of a commercial station.

The Technical Journalism Department offered 30 courses, not all of which were media oriented, during the years in issue. Approximately 10 courses utilized WOI facilities to some extent, and most of these courses considered a variety of media. Only one course related exclusively to television. WOI–TV was again used as a representative example and was one of several stations studied. Courses covered introductory material, advertising, and news writing. Lecturers from WOI and other stations participated in class presentations. Students in Radio and Television News 481 were given staggered assignments in the WOI newsroom and participated in writing news copy for broadcasts under the direction of a WOI staff member. Students enrolled in Informative Writing 475 produced short closed-circuit programs under the direction of a WOI–TV producer-director. WOI facilities and cameramen were used in these productions.

Ten staff members of WOI–AM–FM–TV acted as occasional lecturers in these courses. The actual participation of these staff members varied from lecturing once a year to serving as the regular instructor for a particular course. Along with lecturing and teaching, the staff performed their regular functions at the station.

Aside from the courses noted above, there was no requirement that students work at the WOI facilities. However, about 15 to 20 students at any given time were employed in various capacities

on a part-time basis and were paid by the station for their work. Two graduate students per year worked as interns in the WOI news department.

In contrast to the above educational activities, WOI–TV was operated generally as a commercial station in competition with the two Des Moines stations for audience, programming, employees, and advertising. Promotional efforts took many forms and included spot announcements of future programming, mail circulars, and newspaper advertising. Business Interruption Coverage Insurance alone totaled $665,000 and was based on an estimated gross annual business of $740,000. WOI–TV was self-supporting during the periods in issue, and other departments of the University were billed for services provided by the station at full cost, with the exceptions noted above. The station paid a rental fee to the University for the land occupied by the physical plant.

The main sources of revenue for WOI–TV were network sales, national advertising, and local advertising. Total revenues after the payment of commissions and yearly profits are reflected in the following table:

| Year | Total Revenues | Profit |
|---|---|---|
| 1961 .................... | $739,481 | $203,122 |
| 1962 .................... | 835,750 | 132,253 |
| 1963 .................... | 907,891 | 209,415 |
| 1964 .................... | 1,030,525 | 304,078 |
| 1965 .................... | 1,052,915 | 13,654 |

Advertising sales accounted for 63 percent and sales of time to the network for commercial programming accounted for 28 percent of total revenues. Prices paid by both the network and advertisers were based on two factors: (1) the size of the audience which the station could provide and (2) the time at which the network program or the advertisement was to be broadcast. The highest rates were charged for broadcasts from 6 to 11 p. m., a period which included "prime time", or the maximum audience available throughout the broadcast day. Advertisers were encouraged to purchase time in quantity through the use of bulk discounts and decreasing rates for repeated ads.

WOI–TV contracted with H–R Television, Inc., a national sales representative which, as an exclusive agent of the station, sold advertising time to national advertisers on a commission basis. Contact between the station and the Des Moines office of H–R Television was frequent, and the station provided the representative with availability sheets listing prospective programming as well as rate cards for advertising and production fees. Since the sale of advertising was dependent upon programming and audiences, the availability sheets contained information on ratings. Some advertising came directly through the networks with the commercial programming and the station was paid a portion of the network's receipts from the advertising accounts.

The Sales Department accepted local advertising directly. Separate ledger sheets were kept for each advertising client and at least one full-time employee, along with various others, worked exclusively on billing. The average prices charged by WOI–TV to both the network and advertisers were lower per thousand of circulation than those of the other two local stations.[4]

WOI–TV used network and recorded programming in addition to locally produced broadcasts during the periods in issue. Under a standard affiliation contract, WOI–TV was offered all programming produced by the ABC network.

4. Hourly rates per thousand of circulation averaged as follows:

| | Network | Class "A" Advertising |
|---|---|---|
| WHO ........................................ | $3.58 | $3.56 |
| KRNT ....................................... | 3.65 | 3.21 |
| WOI ........................................ | 3.05 | 3.00 |

The station could refuse to broadcast certain programs offered, a practice known as non-clearance, or could substitute local programming, or preempt, previously cleared offerings. Until 1963, however, the network contract contained a clause under which WOI–TV forfeited the right to refuse network programming at certain times unless the offering was contrary to the public interest or a local program of outstanding public interest would better serve the audience. The times covered by this clause included the bulk of weekday afternoons and evenings and the majority of broadcast time on weekends.[5] Network programming accounted for 52.3 percent of total broadcasts, of which all but 1.7 percent were commercial. Program content was primarily entertainment, but included news, public affairs, and various other types of programming.

The second largest source of programming for WOI–TV was recorded programs, consisting of feature films and syndicates, the latter of which included programs produced for television and series which had not been carried by the networks for one year. In order to use these programs, WOI–TV has to purchase broadcast rights from the owners. Recorded programming constituted 33.7 percent of total programming, of which 19.4 percent carried commercial advertising. Both syndicated programming and feature films were primarily entertainment.

The remaining 14 percent of programming was locally produced. During the years in issue, 66 different local programs or series were produced by the WOI–TV staff. These varied in length from 15 to 130 minutes [6] and in frequency from one broadcast to daily presentation. With three exceptions,[7] all local programs could be termed non-entertainment in content. "TV Schooltime" was, by this time, largely recorded programming. Live non-entertainment programming averaged 567.8 hours per year.[8]

5. The exact times covered were as follows:

*Saturday and Sunday*
10:30 a.m. to 1:00 p.m.
3:30 p.m. to 6:00 p.m.
7:30 p.m. to 10:00 p.m.

*Monday through Friday*
2:00 p.m. to 4:30 p.m.
7:30 p.m. to 10:00 p.m.

6. Local basketball games ran for various lengths.

7. "Graves End Manor" was a series of horror films with local narration. "Bozo" was a cartoon series. The two programs accounted for a total of 774 hours of broadcasts during the years in issue. Both series are listed as recorded programming intended primarily for entertainment on the proposed schedule prepared by the station for filing with the Federal Communications Commission in 1964. "Magic Window", which accounted for 676.5 hours, was a children's entertainment program.

8. Figures for the individual years are as follows:

| Year | Total Local* | Non-Entertainment and Non-Recorded* |
|---|---|---|
| 1962 | 909.5 | 534.5 |
| 1963 | 985.0 | 565.0 |
| 1964 | 1,030.0 | 530.0 |
| 1965 | 1,097.0 | 641.5 |
| Total | 4,021.5 | 2,271.0 |
| Average | 1,005.4 | 567.8 |

* In hours.

The subject matter of these programs included news, instructional programs, local sports events, and special programs on such topics as politics, religion, and activities at Iowa State University. On weekdays, regularly scheduled local programs consisted of two morning presentations of 30 and 45 minutes each, the noon "Farm Report," and late evening news. A half-hour local discussion program was regularly scheduled on Monday at 10:30 p. m. for the first half of the period and Friday at 6:30 p. m. for the remainder of the period. Network programming was refused clearance for the latter time period. Regularly scheduled local programming on weekends consisted of the noon "Farm Report," on Saturday, and half-hour Sunday afternoon. In 1965, the half-hour programs produced by students in the Telecommunicative Arts program were broadcast on Sunday at 11:30 a. m.

■ The primary question here involved is close and perplexing. *See* Myers, Taxing the Colleges, 38 Corn.L. Q. 368, 380 (1953). On balance, however, the facts surrounding the operation of WOI–TV, as summarized above, require a holding that the television revenues constitute unrelated business income to the University and, therefore, the petition should be dismissed.

■ It is not disputed that Iowa State University is itself an exempt organization and that the WOI complex of communications facilities is wholly owned and operated by that institution. The presence of an income tax exemption for the University, however, does not automatically exempt all activities in which it may participate. Income accruing to an educational institution exempt from taxation under Internal Revenue Code § 501(c)(3) [9] is taxable if the income is generated by the operation of an unrelated trade or business.[10] To be taxable, the activity in question must be (1) a trade or business, (2) regularly carried on, and (3) not substantially related, other than through the production of income, to the purpose for which the institution was granted exemption under § 501. Treas.Reg. § 1.513–1(a)(2).

Plaintiff, as it must, admits that WOI–TV is a trade or business within

---

**9.** § 501. *Exemption From Tax On Corporations, Certain Trusts, Etc.*

(a) *Exemption From Taxation.*—An organization described in subsection (c) or (d) * * * shall be exempt from taxation under this subtitle * * *.

\* \* \* \* \*

(c) *List of Exempt Organizations.*—The following organizations are referred to in subsection (a):

\* \* \* \* \*

(3) Corporations, and any community chest, fund, or foundation, organized and operated exclusively for * * * educational purposes * * *.

**10.** § 511. *Imposition Of Tax On Unrelated Business Income*

\* \* \* \* \*

(a)(1) *Imposition of tax.*—There is hereby imposed for each taxable year on the unrelated business taxable income (as defined in section 512) of every organization described in paragraph (2) a normal tax and a surtax computed as provided in section 11 * * *.

(2) *Organizations subject to tax.*—

(A) *Organizations described in section 501(c)(2), (3), (5), and (6)* * * *.—The taxes imposed by paragraph (1) shall apply in the case of any organization * * * which is exempt, except as provided in this part, from taxation under this subtitle by reason of * * * paragraph (3) * * * of section 501(c).

(B) *State colleges and universities.*—The taxes imposed by paragraph (1) shall apply in the case of any college or university which is an agency or instrumentality of any government or any political subdivision thereof, or which is owned or operated by a government or any political subdivision thereof, or by any agency or instrumentality of one or more governments or political subdivisions. Such taxes shall also apply in the case of any corporation wholly owned by one or more such colleges or universities.

\* \* \* \* \*

§ 512. *Unrelated Business Taxable Income*

(a) *Definition.*—The term "unrelated business taxable income" means the gross income derived by any organization from any unrelated trade or business (as defined in section 513) regularly carried on by it, less the deductions allowed by this chapter which are directly connected with the carrying on of such trade or business, * * *.

the meaning of § 513.[11] In addition, there is no disagreement concerning the second requirement of the § 513 regulations. The record is clear that WOL–TV has presented continuous and regular broadcasts since 1950.

The third requirement is more complex. The applicable regulations state that ordinarily a trade or business—

> is substantially related * * * if the principal purpose of such trade or business is to further (other than through the production of income) the purpose for which the organization is granted exemption. In the usual case the nature and size of the trade or business must be compared with the nature and extent of the activities for which the organization is granted exemption in order to determine whether the principal purpose * * * is to further * * * the purpose for which the organization is granted exemption. Treas.Reg. § 1.513–2(a)(4).

Treating the University as exempt under § 501(c)(3), the applicable definition of its exempt purpose, education, is found in Treas.Reg. § 1.501(c)(3)–1(d)(3), as follows:

> *Educational defined*—(i) *In general.* The term "educational", as used in section 501(c)(3), relates to—
>
> (a) the instruction or training of the individual for the purpose of improving or developing his capabilities; or
>
> (b) the instruction of the public on subjects useful to the individual and beneficial to the community.

Thus, the method for determining and weighting the purposes of the activity in question is a comparison of the nature and size of the commercial television operations with the extent and scope of its educational operations. The regulations contain an example of this distinction particularly appropriate in this case:

> * * * A university radio station * * * is considered * * * related * * * if operated primarily as an integral part of the educational program of the university, but is considered * * * unrelated * * * if operated in substantially the same manner as a commercial radio station * * * Treas.Reg. § 1.513–2(a)(4).

A typical commercial facility, of course, is one whose primary purpose is profit maximization. Thus, for the purposes of § 513, the relevant considerations here are (1) those factors which might distinguish WOI–TV from other commercial stations, and (2) whether the presence of these factors either changed the essential nature of the station or justified the scope of its commercial operations.

█ Determination and weighting of the purposes of a business with diversified activities is admittedly difficult. The problem is not novel, however, in this and other courts, and certain helpful guidelines have been established. Profits are, although not conclusive, at

---

11. § 513. *Unrelated Trade or Business*

(a) *General rule.*—The term "unrelated trade or business" means, in the case of any organization subject to the tax imposed by section 511, any trade or business the conduct of which is not substantially related (aside from the need of such organization for income or funds or the use it makes of the profits derived) to the exercise or performance by such organization of its charitable, educational, or other purpose or function constituting the basis for its exemption under section 501 (or, in the case of an organization described in section 511(a)(2)(B), to the exercise or performance of any purpose or function described in section 501(c)(3)), except that such term does not include any trade or business—

(1) in which substantially all the work in carrying on such trade or business is performed for the organization without compensation; or

(2) which is carried on, in the case of an organization described in section 501(c)(3) or in the case of a college or university described in section 511(a)(2)(B), by the organization primarily for the convenience of its members, students, patients, officers, or employees; or

(3) which is the selling of merchandise, substantially all of which has been received by the organization as gifts or contributions.

least some evidence that the business purpose is primary. American Institute for Economic Research v. United States, 302 F.2d 934, 938, 157 Ct.Cl. 548, 556 (1962), cert. denied, 372 U.S. 976, 83 S. Ct. 1109, 10 L.Ed.2d 141 (1963). Very substantial profits, or profits relatively large when compared with expenses, are also not conclusive but do constitute some evidence indicative of a commercial enterprise. Scripture Press Foundation v. United States, 152 Ct.Cl. 463, 468, 470, 285 F.2d 800, 803, 806 (1961), cert. denied, 368 U.S. 985, 82 S.Ct. 597, 7 L. Ed.2d 523 (1962). It has been observed that fundamental to the loss of exempt status by Scripture Press Foundation were findings of large profits, substantial accumulations of income, and relatively small amounts of actual exempt activity. *See* Edward Orton, Jr., Ceramic Foundation, 56 T.C. 147, 159–160, 162–164 (1971). The record here supports similar findings with respect to the manner in which the University conducted the operations of WOI–TV.

Initially, WOI–TV was meant to be, and always has been, a profitable enterprise. During the years in issue, revenues ranged from $739,481 to $1,052,914, while profits for the first four years ranged from $132,253 to $304,079. Profits in 1965 were $13,654. Reinvestment in the business was substantial, with $990,000 being invested in the Communications Center alone. *Cf.* Edward Orton, Jr., Ceramic Foundation, *supra,* 56 T.C. at 164. Although the total revenues of WOI–TV were substantially less than those of its regional competitors,[12] the station offered advertising time at rates per thousand of circulation somewhat lower than those of the two Des Moines stations.

■ As pointed out above, however, the presence of a profit motivation is not wholly determinative of the issue. Of greater importance is the manner in which the enterprise is conducted; a profitable operation may be justified by factors which, on balance, show that the conduct of the business was substantially related to the exempt purpose of the institution. *Compare,* for example, Parker v. Commissioner of Internal Revenue, 365 F.2d 792, 798–799 (8th Cir. 1966), cert. denied, 385 U.S. 1026, 87 S. Ct. 752, 17 L.Ed.2d 674 (1967), with Campbell v. Big Spring Cowboy Reunion, 210 F.2d 143, 146 (5th Cir. 1954).

■■ In analyzing the method of operation of WOI–TV, it is important to understand the position taken by the plaintiff's witnesses. Station management, University administrators, and faculty have repeatedly emphasized that the only reason for the operation of WOI–TV was to further the educational goals of the University. The sincerity of the belief thus expressed by these witnesses, many of them distinguished educators on the Iowa State faculty, can hardly be questioned. Indeed, since total television net revenues were obviously for the sole benefit of Iowa State, their testimony would be sufficient to justify a decision in favor of the University were it not for Congressional action in 1950 which terminated the previously existing "destination-of-income" test, thus overruling the theretofore leading decision of Trinidad v. Sagrada Orden de Predicadores, 263 U.S. 578, 44 S. Ct. 204, 68 L.Ed. 458 (1924). The purpose of this legislation was to tax commercial enterprises operated by charitable organizations on the same basis as their tax-paying competitors, regardless of whether such enterprises were operated directly as divisions of charitable organizations, like WOI–TV, or operated indirectly as separate incorporated feeders. *See,* H.Rept. No. 2319, 81st Cong., 2d Sess. (1950–2 C.B. 380 et seq.); S.Rept. No. 2375, 81st Cong. 2d Sess. (1950–2 C.B. 483 et seq.). For a further discussion of this change in tax law, *see* SICO Foundation v. United States, 295 F.2d 924, 155 Ct.Cl. 554 (1961). The effect of the 1950 legisla-

---

13. On a nationwide basis, ABC affiliates, such as WOI–TV, consistently rank lowest in revenues among stations affiliated with the three major commercial networks.

tion was to abandon the preexisting doctrine that the destination of income (*i. e.* for the exempt Iowa State) was more important than its source (*i. e.* a commercial enterprise such as WOI–TV). Thereafter, "source" of the income was the important consideration in determining exemption, and it is probable that plaintiff's witnesses simply did not understand this change in legal climate.

That the "source" here (WOI–TV) is, and always has been, a commercial enterprise cannot be doubted. A commercial station was originally chosen as a medium because of two difficulties inherent with all educational stations— problems of funding and difficulties in holding audiences. The administration felt that a commercial station could attract and retain a qualified staff which would then be available also to produce local programs of high quality and quantity. Audiences would be provided by using popular entertainment programs as a lure to secure the maximum available number of viewers. This method of building and retaining of audiences is termed "audience flow" and is loosely based on a theory of viewer inertia. The presentation of entertainment programming was also felt to contribute to a practice of habitual viewing patterns in which viewers would return to a station which regularly presented programming acceptable to them.

The building and retention of large audiences is a major factor in the development of a television station's revenue, and in the presentation of entertainment programming. As such, it is a typical aim of commercial television stations. The WOI–TV affiliation with the ABC network and the station's advertising operations were virtually indistinguishable from those of other commercial stations. Its balance between entertainment and nonentertainment programming was also typical. Approximately 75 percent of total programming was commercially sponsored and station policy would have allowed up to 85 percent if paid advertising were available to support the additional amount. Pro-

gramming policy also indicates that the maximization of revenues was the primary, not to mention overwhelming, goal in the conduct of the business. WOI–TV was paid by the ABC network on the basis of the number of hours of commercial programming accepted and broadcast, and virtually all offered network programs were accepted. If a program were preempted for local broadcasts, substitute time for the network program was generally offered. Syndicates and feature films were selected by the station management in coordination with the sales staff for their audience potential. Local programming, although a fine effort and of great value to audiences, did not differ substantially either in quantity or subject matter from that of stations whose admitted goal was profit maximization. Many of these programs carried typical commercial advertising or "messages" to use the advertiser's euphemism. Live nonentertainment program produced by the WOI–TV staff during the periods in issue averaged approximately 11 hours per week, of which about 9 hours were regularly scheduled. In comparison, the average educational station, handicapped as it may be by lack of funds, produced an average of about 19 hours of local educational programming per week. Thus, it is impossible to conclude that the maximization of local educational and public affairs programs was the primary aim in the operation of WOI–TV. Indeed, the commercial aspects were so overwhelming as to make it impossible for the operation of WOI–TV to be substantially related to the educational purposes of the University.

Neither do the other activities of the station supported a finding that WOI–TV was operated substantially for the achievement of educational goals aside from the need of the University for additional revenues. Public interest programming, presentations by an extension service, in-school classroom broadcasts, and the employment of qualified students are not unique to WOI–TV. The only activities which would appear

to distinguish this station from other commercial stations were its closed-circuit operations, its participation in two courses in which students worked at the station as part of their course assignments, and its close relationship with the Extension Service.

■ It is clear that a substantial investment was made by the station in closed-circuit equipment for classroom use. In addition, the station participated in the partial presentation of from two to five of some 2,000 courses offered each year, but this limited participation would hardly change the nature of commercial operations of the magnitude discussed above. Undoubtedly, the presence of an efficient advertising operation was valuable in the teaching of two advertising courses. The two courses in which students worked in the WOI newsroom and produced programs for local broadcasts were clearly valuable experience. However, the station was not meant to be, and was not, a vocational training center for students. With the above exceptions, all students working at the station were selected on the basis of their ability and were paid by the station. Extension programming on a regular basis was certainly a laudable endeavor. Here again, however, the station's efforts were not totally gratuitous. The Extension Service had three programming specialists and the station was reimbursed, at least in part, for its expenses. Either individually or in combination, these factors do not serve to change the essentially commercial nature of the station, and, as previously noted, the fact that its net profits from such commercial operations were ultimately destined for the educational uses of the University becomes irrelevant in the light of § 513(a), *supra*.

■ It cannot fairly be said that WOI–TV operations were wholly unrelated to the educational purposes of the University, or that the educational activities of the station were incidental. The issue here is, however, whether the conduct of WOI–TV, which includes the goals of that station, was substantially related to the educational purposes of the University. The facts support a conclusion that the commercial aspects and the emphasis on revenue maximization were the overwhelming goals of the operation of the station; and, thus, the business was not substantially related to the educational purposes of the University. Thus, WOI–TV falls squarely within the definition of an unrelated trade or business the income from which is taxable to the University under § 511(a)(2)(B). *See* Rev.Rul. 55–676, 1955–2 C.B. 266 and Mertens, Law of Federal Income Taxation, Vol. 6, § 34.-14a at p. 95 (1968).

■ Plaintiff's alternative position is that, assuming WOI–TV constitutes an unrelated trade or business, all of the expenses generated by the operation of nonprofit WOI–AM and WOI–FM may be offset against WOI–TV income. The plaintiff first argues that the radio and television stations constitute, in the factual sense, an integrated operation. We view the facts as establishing precisely the opposite. Perhaps most significant in this determination is the non-commercial nature of the radio stations. State appropriations were the only source of funding for these two stations and, although they received benefits from the new Communications Center and its modern facilities, the profits and revenues generated by the commercially operated television station were not generally available to the radio stations. Despite some sharing of functions on the part of staff members, expenses were divided by the accounting department between the two media.

In addition, although all the stations were under a single general manager and chief engineer, on the next level of management each medium had a separate associate manager and engineer-in-charge. Below this level, approximately two-thirds of the staff worked for only one medium, and of those serving both media, half worked predominantly in

television. Until May of 1964, the stations were separated physically.

This is not to say that the radio and television stations were totally unrelated. The news and weather departments, for example, would be difficult to divide by the relative time devoted to either medium. Other departments also show a sharing of functions in varying degrees. However, the weight of the evidence, in particular, the fiscal differences, establish that the radio and television facilities were not operated as, and did not constitute, a single integrated trade or business.

 Even if the three stations were considered functionally integral, the regulations themselves would foreclose any argument that the three could comprise one trade or business for the purposes of § 513. Treas.Reg. § 1.513–2(a)(1) states that, for the purposes of § 513, the term "trade or business" has the same meaning as it has in § 162, governing the deduction of business expenses. Although the latter section also lacks a definition of the term, case law interpreting the provision, not surprisingly, distinguishes between profit and nonprofit motivated activities and concludes that a nonprofit endeavor, even if operated by a profit-making concern, does not constitute a trade or business for the purposes of the deduction of expenses under § 162. American Properties, Inc., 28 T.C. 1100 (1957), aff'd per curiam, 262 F.2d 150 (9th Cir. 1958). See, also, W. C. Hudlow, Jr., 30 T.C.M. 894 (1971), and Joseph V. Curran, 29 T.C.M. 696 (1970). Thus, it appears equally impermissible to combine commercial and noncommercial facilities as one trade or business for the purposes of § 513.

The plaintiff relies primarily on the case of Anaheim Union Water Co. v. Commissioner of Internal Revenue, 321 F.2d 253 (9th Cir. 1963),[13] for the proposition that profit and nonprofit activities could be aggregated and treated as one trade or business. Anaheim involved a nonprofit water company which developed water and water service for shareholders. Certain of the lands acquired by Anaheim, however, became a source of substantial, unrelated revenue in the form of oil royalties, rentals, and other miscellaneous sources. The company was thus able to provide water to its shareholders at or below cost, the charge being the difference between unrelated income and expenses incurred by the companies. When the taxpayer attempted to offset against unrelated income, the cost of acquisition and distribution of water, the Government balked and sought to limit the deductible costs to income received. The Government contended, with success in the Tax Court,[14] that expenses in excess of income were not "ordinary and necessary expenses." It should be pointed out that, as the Tax Court later said,

> [5] In Anaheim, respondent did not argue the expenses were not paid or incurred in carrying on any trade or business. The Court stated: "It is not disputed that Anaheim during 1952–54 was carrying on a business—the furnishing and delivery of water to those of its shareholders who desired to purchase water." [Adirondack League Club, 55 T.C. 796, 808, n. 5 (1971).]

A case could be made that Anaheim is distinguishable from the instant case on the basis of the Government's failure to argue in Anaheim that expenses were not paid or incurred in carrying on a trade or business, an issue hotly disputed before this court. However, the Ninth Circuit in subsequent cases, Bear Valley Mutual Water Co. v. Riddell, supra n. 13, and San Antonio Water Co. v. Riddell, supra n. 13, ruled directly against the Government's assertion that

---

13. See, also, Bear Valley Mutual Water Co. v. Riddell, 427 F.2d 713 (9th Cir. 1970); San Antonio Water Co. v. Riddell, 427 F.2d 713 (9th Cir. 1970).

14. 35 T.C. 1072 (1961).

the expenses were not paid or incurred in carrying on a trade or business. To the extent that the Ninth Circuit's rulings contemplate a "business" in the absence of a profit motive, we must respectfully disagree. We find that reason and case law authority stand for the proposition that a profit motive is intrinsic to the concept of a business. In the Ninth Circuit's water rights cases, *supra*, the purpose was never profit; it was always to provide water and water services to the shareholders. We believe the Ninth Circuit was in error in allowing the two distinct activities—one profit motivated and one not—to be amalgamated.

In Adirondack League Club, 55 T.C. 796 (1971), aff'd, 458 F.2d 506 (2d Cir. 1972), the petitioner, a nonprofit New York membership corporation, was organized for, *inter alia*, the maintenance of an ample preserve for the benefit of its members for the purpose of hunting, fishing, rest, and recreation. Petitioner, however, also conducted timber operations on its property. The issue was whether an amount representing the excess of expenses incurred in maintaining and providing facilities and services over membership dues and fees could be offset against timber income. The Tax Court held the expenses in issue were not deductible since they did not arise from the "carrying on of any trade or business." The Tax Court found it necessary, as we do, to disagree with the Ninth Circuit's water-rights cases and to require a basic profit motive as a *sine qua non* to carrying on a business. There was no profit motive with respect to the hunting preserve; and, thus, the "net loss" from that activity could not be offset against the timber business gains.

Likewise, in Five Lakes Outing Club v. United States, 468 F.2d 443 (8th Cir. 1972), a social club incurred losses on its recreational operations but received income from rentals on adjacent land which it had purchased. The Eighth Circuit after approving the disallowance of the offset when no profit motive was present or when an activity of a profit-motivated enterprise constituted a "hobby" said:

\* \* \* The only issue in either case is whether a corporation can merge the tax consequences of profitable and nonprofit activities simply by putting them under a single corporate roof. That question, of course, turns on whether a profit motive is a prerequisite to deductibility under § 162(a). For the reasons well-stated by the Tax Court, and adopted by the Second Circuit, we agree that it is. See Adirondack League Club, 55 T.C. at 808–809, 815–819, aff'd, 458 F.2d 506. [468 F.2d at 445.]

In the instant case we have already determined that WOI–TV is an unrelated trade or business within the meaning of § 513. Within that ultimate conclusion is the finding that it was profit motivated. Plaintiff is now attempting to offset the excess expenses of its radio stations, WOI–AM and –FM, which are clearly and, in fact, conceded to be nonprofit activities against its profit-motivated activities. WOI–AM and –FM were performing educational functions, seeking no revenue at all and wholly subsidized out of the State's subsidy to the University. For the factual and legal reasons discussed above, such amalgamation of profit and nonprofit activities is not possible. Adirondack League Club, *supra*; Five Lakes Outing Club v. United States, *supra*; American Properties, Inc., *supra*; and *see also*, Patterson v. United States, 459 F.2d 487, 493, 198 Ct.Cl. 543, 552 (1972), in which this court reaffirmed the concept, albeit in a different context, basic to the tax law, that "[t]he ultimate guideline in determining whether a venture is a business rather than a hobby is the presence of a good faith intent to make a profit. \* \* \* "

Finally, counsel for the University assert that the levy of a tax on the income of WOI–TV would be tantamount to the levy of an income tax on the State of Iowa which owns the University and hence WOI–TV. This, say counsel,

would constitute an unconstitutional burden laid by the Federal Government on the activities of a sovereign state. Moreover, they argue that WOI–TV revenues are excluded from gross income by § 115(a)(1) which states that gross income does not include:

income derived from any public utility or the exercise of any essential governmental function and accruing to a State * * *.

■ Neither point is persuasive. Referring first to the § 115 argument, it will be noted that the section excludes only income derived from the exercise of any "essential governmental function." However strongly it might be urged that the operation of a purely educational television station would constitute an "essential governmental function," it certainly cannot be fairly argued that the operation of a commercial station could be so classified. Once again, it would seem that plaintiff's approach is colored by its continuing emphasis on the obsolete "destination of income" test and its failure to recognize the Congressional change to "source" as the test of unrelated business income.

■ Passing to the remaining issue of constitutionality, it is our view that the United States Supreme Court has resolved this question adversely to plaintiff's contention. For example, in Allen v. Regents of University System of Georgia, 304 U.S. 439, 58 S.Ct. 980, 82 L.Ed. 1448 (1938), the question was whether the exaction of the Federal admissions tax in respect of athletic contests in which teams of state colleges participated unconstitutionally burdens a governmental function of the State of Georgia. In holding that the immunity implied from the dual sovereignty recognized by the Constitution does not extend to business enterprises conducted by the States for gain, the Court said at 304 U.S. 451, at 58 S.Ct. 985:

* * * In final analysis the question we must decide is whether, by electing to support a governmental activity through the conduct of a business comparable in all essentials to those usually conducted by private owners, a state may withdraw the business from the field of federal taxation.

When a state embarks in a business which would normally be taxable, the fact that in so doing it is exercising a governmental power does not render the activity immune from federal taxation. In South Carolina v. United States, 199 U.S. 437, [26 S.Ct. 110, 50 L.Ed. 261, 4 Ann.Cas. 737] it appeared that South Carolina had established dispensaries for the sale of liquor and prohibited sale by other than official dispensers. It was held that the United States could require the dispensers to take licenses and to pay license taxes under the Internal Revenue law as applicable to dealers in intoxicating liquors, and this notwithstanding the State had established the dispensary system in the valid exercise of her police power. * * *

See also, New York v. United States, 326 U.S. 572, 66 S.Ct. 310, 90 L.Ed. 326 (1946) where a divided Court held that the sale by New York of mineral waters from Saratoga Springs was not constitutionally immune from the Federal tax on sale of mineral waters. Said the Court (per Mr. Justice Frankfurter) at 326 U.S. 582, at 66 S.Ct. 314:

* * * But so long as Congress generally taps a source of revenue by whomsoever earned and not uniquely capable of being earned only by a State, the Constitution of the United States does not forbid it merely because its incidence falls also on a State.

Counsel for plaintiff attempt to distinguish these cases on the ground that they dealt with Federal excise taxes as opposed to Federal income taxes. However, the reasoning in the Supreme Court's decisions is broad enough to make this a distinction without a difference.

For all of the above reasons, the petition herein is hereby dismissed.

NICHOLS, Judge (concurring in part, dissenting in part):

I agree that WOI–TV is an unrelated business activity to Iowa State University. However, I deem that the two radio stations are so integrated with the TV station that their excess expenses should be offset under the Code. I join the majority again in failing to see any issue of Constitutional dimensions.

The integration issue is primarily factual. I note that the joinder of radio and TV facilities is ordinary and usual. There is reference in the findings to two other instances in the Des Moines-Ames market alone. It is natural as permitting fuller employment of sportscasters, weather prophets, news analysts, etc., as well as studios and other technical facilities, and it allows of a fuller saturation of the available market. In various fields the joinder of profit making and unremunerative activities is ordinary and usual. Should members and associates of a law firm devote some portion of their time to *pro bono publico* activities, as, *e. g.*, representing indigents in court, I would not expect the tax man to demand the segregation and disallowance of a corresponding portion of the law firm's costs. Yet that is a logical corrollary of the reasoning used here, and one that no doubt we will come to.

The cases cited do not deal with factually integrated business operations and do not warrant the disallowance of the costs of a division or branch of an enterprise merely because it is, temporarily or permanently, unprofitable.

More to the point is the court's holding that the TV profits were not "generally" diverted to support the radio stations. Support came, the court says, out of the state's "subsidy" to the University. We are not given details as to the state's appropriation procedure, or whether it included "line items". One gathers from the summary in Finding 59 that the University kept its revenues out of "miscellaneous receipts" and ob-

tained appropriation only of enough to cover its overall deficit. Thus the TV earnings apparently operated to reduce the subsidy necessary. The absence of effort to sell advertising on the radio had significance. If the radio stations developed some revenue, even if not enough to cover their costs, plaintiff would have a stronger case, one must concede. I do not deem the point conclusive, however, in light of the very generalized finding.

The separate management and accounting maintained for TV and radio is without significance, as the following quote sufficiently shows:

### ACCOUNTING FOR DEPARTMENTAL OPERATIONS

Management of an enterprise that sells two or more distinct classes of services or commodities or that is divided into departments, needs accounting reports to evaluate the various segments of the business. * * *

* * * * * *

* * * In a modern department store, for example, there are a number of distinct departments each under the control of a departmental manager. A departmental breakdown for accounting and reporting helps place responsibility for the control of a department's operations upon departmental managers. It assists top management both in evaluating the relative operating efficiencies of individual departments and in planning future operations. [C. Niswonger and P. Fess, Accounting Principles, pp. 469–70 (10th ed. 1969). *See also* C. Horngren, Accounting for Management Control, Chapter 11 (2d ed. 1970).]

In short, I do not assert that the losses of an unrelated *pro bono publico* activity may be offset against the profits of a business enterprise, but I deny that the activity here is unrelated. It has a close and intimate relation, as the undisputed facts all show.