CITY OF NEW YORK, Plaintiff,
v.
UNITED STATES of America, Defendant.

No. 74 Civ. 1538 (JMC).

United States District Court,
S. D. New York.

May 14, 1975.

W. Bernard Richland, Corp. Counsel of the City of New York (Samuel J. Warms and Raymond Herzog, Asst. Corp. Counsels, New York City, of counsel), for plaintiff.

Paul J. Curran, U. S. Atty., S.D.N.Y. (John S. Siffert, Asst. U. S. Atty., of counsel), for defendant.

## OPINION

CANNELLA, District Judge:

This action was commenced by the City of New York pursuant to 28 U.S.C. § 1346 for the refund of certain excise taxes which have been paid to the Federal Government. The sole issue presented for our determination is whether the excise tax on amounts paid for transportation of persons by air under § 4261 of the Internal Revenue Code, 26 U.S.C. § 4261, may constitutionally be imposed on city expenditures for employees traveling on official city business. As we find that the constitutional doctrine of intergovernmental tax immunity does not bar the imposition of this tax, the motion of the United States to dismiss the complaint pursuant to Fed.R.Civ.P. 12(b)(6) is hereby granted.

## THE FACTS

The City claims that during the period of July 1, 1970 through May 31, 1972 certain of its employees traveled by air while conducting necessary, official New York City business. These employees purchased and paid for air transportation and such air fare included the federal excise tax specified in § 4261. The employees were later reimbursed by the City for the expenses incurred.

On July 23, 1972, the City filed a claim for refund of the taxes now in suit—$80,500. On January 19, 1973, the Internal Revenue Service notified the City that its claim had been rejected. Thereafter, on April 3, 1974, the instant action was commenced.[1]

## THE STATUTORY SCHEME

The excise tax provision here at issue (§ 4261), while a long-standing part of the Code, was significantly amended as part of the Airport and Airway Revenue Act of 1970;[2] legislation which was passed in conjunction with the Airport and Airway Development Act of 1970.[3] The stated purpose of these enactments was to aid in the substantial expansion, improvement and development of the American airport and airway system in order to meet future needs and demands for these facilities.[4]

With regard to the instant dispute, the changes which the 1970 Act effected upon § 4261[5] are not as important as the

---

1. The action appears to have been timely filed under 26 U.S.C. § 6532(a)(1) and venue is proper, 28 U.S.C. § 1402(a)(2).

2. Title II, Pub.L. 91–258, 84 Stat. 236 (effective July 1, 1970).

3. Title I, Pub.L. 91–258, 84 Stat. 219.

4. See, § 2, Title I, Pub.L. 91–258, supra; H.Rep.No.91–601, 91st Cong., 1st Sess. in 1970 U.S.Code Cong. and Admin.Naws at pp. 3047 and 3082.

5. In its present form, § 4261(a) of the Code states:

(a) In general.—There is hereby imposed upon the amount paid for taxable transportation (as defined in section 4262) of any person which begins after June 30, 1970, a tax equal to 8 percent of the amount so paid.

In the case of amounts paid outside of the United States for taxable transportation, the tax imposed by this subsection shall apply only if such transportation begins and ends in the United States.

§ 4262, in turn, defines "taxable transportation" as "transportation by air" and further states:

(a) Taxable transportation; in general.—For purposes of this part, except as provided in subsection (b), the term "taxable transportation" means—

(1) transportation by air which begins in the United States or in the 225-mile zone and ends in the United States or in the 225-mile zone; and

(2) in the case of transportation by air other than transportation described in paragraph (1), that portion of such transporta-

impact which it had upon § 4292 of the Code (26 U.S.C. § 4292). Prior to July 1, 1970 (the effective date of the amendments), § 4292 exempted from the excise tax imposed under § 4261 "any payment received for services or facilities furnished to the Government of any State, Territory of the United States, or any political subdivision of the foregoing or the District of Columbia." The Airport and Airway Revenue Act of 1970, however, deleted the reference to § 4261 from § 4292,[6] thus completely withdrawing from the law the previous statutory grant of immunity accorded to New York City and other political entities. The rationale for this legislative decision is made abundantly clear in the House Report, which states:

> Present law provides a series of exemptions from the tax on transportation of persons by air. These include exemptions: . . . (5) for transportation furnished to the United States (at the discretion of the Secretary of the Treasury) and to State and local governments . . . .
>
> The Ways and Means Committee has deleted most of these exemptions either as obsolete provisions or as unnecessary complications of existing law. . . .
>
> . . . . . .
>
> The exemptions for transportation furnished to State and local governments, the United States, and nonprofit educational organizations are terminated. . . . It did not seem appropriate to continue special exemptions for these governmental and educational organizations since this tax is now generally viewed as a user charge. In this situation there would appear to be no reason why these governmental and educational organizations should not pay for their share of the use of the airway facilities. Moreover, should these exemptions be retained where now applicable, it would be difficult to see why other equally meritorious nonprofit organizations should not also be granted exemption.

H.Rep. No. 91–601, 91st Cong., 1st Sess. in 1970 U.S.Code Cong. and Admin. News at pp. 3090–91.[7] Hence, under the present statutory scheme the only basis upon which the City might avoid

---

tion which is directly or indirectly from one port or station in the United States to another port or station in the United States, but only if such portion is not a part of uninterrupted international air transportation . . . . .

. . . . . . .

(c) Definitions.—For purposes of this section—

(1) Continental United States.—The term "continental United States" means the District of Columbia and the States other than Alaska and Hawaii.

(2) 225–MILE ZONE.—The term "225-mile zone" means that portion of Canada and Mexico which is not more than 225 miles from the nearest point in the continental United States.

(3) Uninterrupted international air transportation.—The term "uninterrupted international air transportation" means any transportation by air which is not transportation described in subsection (a) (1) and in which—

(A) the scheduled interval between (i) the beginning or end of the portion of such transportation which is directly or indirectly from one port or station in the United States to another port or station in the United States and (ii) the end or beginning of the other portion of such transportation is not more than 6 hours, and

(B) the scheduled interval between the beginning or end and the end or beginning of any two segments of the portion of such transportation referred to in subparagraph (A) (i) is not more than 6 hours. . . .

6. Prior to the 1970 amendment § 4292 stated:
Under regulations prescribed by the Secretary or his delegate, no tax shall be imposed under section 4251 or 4261 upon any payment received for services or facilities furnished to the Government of any State, Territory of the United States, or any political subdivision of the foregoing or the District of Columbia.
§ 205 (a) (2) of the Airport and Airway Revenue Act of 1970 (Title II, Pub.L. 91–258, 84 Stat. 236) deleted the phrase "or 4261" from the statute. (§ 4251 imposes a tax on certain communications services, such as telephone services, and is not here relevant.)

7. For further discussion of the legislative history of the provisions at bar, see, Texas

the air transportation excise tax is under the constitutional doctrine of intergovernmental tax immunity.

## INTERGOVERNMENTAL TAX IMMUNITY

The City premises its present claim upon the assertion that "a political subdivision of a state which exercises governmental functions may not be subjected in performing those functions to a federal tax." [8] Thus, it relies upon the intergovernmental tax immunity which is said to arise by implication from the federal constitution; a doctrine which finds its origin in McCulloch v. Maryland, 17 U.S. (4 Wheat) 316, 4 L.Ed. 579 (1819). The doctrine enjoyed great success and was frequently invoked by courts during the late nineteenth and early twentieth centuries and it is upon the case law generated during this earlier period that the City places principal reliance.[9] However, as Professors Freeland and Stephens have observed: "Despite its bold beginning and vigorous earlier life, the doctrine of intergovernmental immunity has suffered a marked decline over the past half century." J. Freeland & R. Stephens, Fundamentals of Federal Income Taxation 247 (1972). A particularly crushing blow to the preexisting doctrine came in 1946, when the Supreme Court decided New York v. United States, 326 U.S. 572, 66 S.Ct. 310, 90 L.Ed. 326 (1946). That case stands as the Court's most recent pronouncement in this area and is, in the opinion of this Court, clearly preclusive of the City's claim. The opinions of the several Justices in New York v. United States render the earlier decisions of but historical interest and, to use Professor Griswold's phrase, "the doctrine of immunity was limited" in scope and utility by the views there expressed. E. Griswold, Federal Taxation 29 (6th ed. 1966).

The Court's decision in New York v. United States is itself somewhat curious precedent because no opinion of the Court actually exists. Mr. Justice Frankfurter "announced the judgment of the Court and delivered an opinion in which Mr. Justice Rutledge joined." 326 U.S. at 573, 66 S.Ct. at 310. Mr. Justice Rutledge separately concurred and Chief Justice Stone, joined by Justices Reed, Murphy and Burton, issued a concurring opinion. Mr. Justice Douglas, joined by Mr. Justice Black, dissented. This division of the Court and the policy considerations which are attendant thereon, while of significance in a close case, are without impact in the matter at bar since no difference in result is obtained when the present facts are viewed through either the Frankfurter or Stone formulation.

---

v. United States, 72–2 U.S.Tax Cas. ¶ 16,048 at 86,128 (W.D.Tex.1972), aff'd mem., 73–1 U.S.Tax Cas. ¶ 16,085 at 81,394 (5 Cir. 1972).

8. City's Brief at 8.

9. In chronological order, the cases cited by the City are: Collector v. Day, 78 U.S. (11 Wall.) 113, 20 L.Ed. 122 (1870) ; South Carolina v. United States, 199 U.S. 437, 26 S.Ct. 110, 50 L.Ed. 261 (1905) ; Ohio v. Helvering, 292 U.S. 360, 54 S.Ct. 725, 78 L.Ed. 1307 (1934) ; Helvering v. Gerhardt, 304 U.S. 405, 58 S.Ct. 969, 82 L.Ed. 1427 (1938) ; Allen v. Regents of the University System of Georgia, 304 U.S. 439, 58 S.Ct. 980, 82 L.Ed. 1448 (1939), and Graves v. New York ex rel. O'Keefe, 306 U.S. 466, 59 S.Ct. 595, 83 L.Ed. 927 (1939). These decisions, together with other leading immunity cases and New York v. United States, 326 U.S. 572, 66 S.Ct. 310, 90 L.Ed. 326 (1946), are digested and discussed in: E. Barrett & P. Bruton, Constitutional Law 483–495 (4th ed. 1973) ; P. Kauper, Constitutional Law 452–488 (4th ed. 1972) ; G. Gunther & N. Dowling, Constitutional Law, 752–765 (8th ed. 1970) ; W. Lockhart, Y. Kamisar & J. Choper, Constitutional Law 440–460 (2nd ed. 1967) ; McCormack, Intergovernmental Immunity and the Eleventh Amendment, 51 N.C.L. Rev. 485, 488–493 (1973). Each of these authors recognizes that the immunity doctrine is only a shadow of its former self and that the courts have, during the more recent years, restricted its scope with each decision.

The leading pre-New York v. United States articles in this area are those of Professor Thomas Reed Powell. Powell, The Waning of Intergovernmental Tax Immunities, 58 Harv.L.Rev. 633; and The Remnant of Intergovernmental Tax Immunities, 58 Harv. L.Rev. 757 (1945).

Mr. Justice Frankfurter, after first noting that Article I, § 9 of the Constitution ("Congress can lay no tax 'on Articles exported from any State'" (326 U.S. at 575, 66 S.Ct. at 311)) imposed the only direct constitutional limitation upon the federal taxing power vis-a-vis the states, recognized that other tax immunity doctrines derived from Chief Justice Marshall's famous phrase "the power to tax involves the power to destroy." *Id.* at 575-76, 66 S.Ct. at 311. The Justice, in an apparent effort to simplify the immunity doctrine and advance a more workable standard, began his endeavor by outrightly rejecting the older premise of reciprocal intergovernmental tax immunity. Placing emphasis upon Mr. Justice Bradley's dissenting opinion in Collector v. Day, 78 U.S. (11 Wall.) 113, 128-29, 20 L.Ed. 122 (1870), Frankfurter concluded that reciprocity of tax immunities was an unwarranted inhibition upon the federal system of government. *Id.* 326 U.S. at 577-82, 66 S.Ct. 310. In its place, Justice Frankfurter promulgated a new test of tax immunity—a standard which validates a federal tax which falls upon a state entity when the tax is found to be nondiscriminatory.

There are, of course, State activities and State-owned property that partake of uniqueness from the point of view of intergovernmental relations. These inherently constitute a class by themselves. Only a State can own a Statehouse; only a State can get income by taxing. These could not be included for purposes of federal taxation in any abstract category of taxpayers without taxing the State as a State. But so long as Congress generally taps a source of revenue by whomsoever earned and not uniquely capable of being earned only by a State, the Constitution of the United States does not forbid it merely because its incidence falls also on a State. If Congress desires, it may of course leave untaxed enterprises pursued by States for the public good while it taxes like enterprises organized for private ends.

[Citations omitted.] If Congress makes no such differentiation and, as in this case, taxes all vendors of mineral water alike, whether State vendors or private vendors, it simply says, in effect, to a State: "You may carry out your own notions of social policy in engaging in what is called business, but you must pay your share in having a nation which enables you to pursue your policy."

*Id.* at 582, 66 S.Ct. at 314. Moreover, Justice Frankfurter expressly rejected the distinctions previously drawn between the "governmental" and "proprietary" functions of state and local entities as "to shifting a basis for determining constitutional power and too entangled in expediency to serve as a dependable legal criterion." *Id.* at 580, 66 S.Ct. at 313. He concluded by stating:

we decide enough when we reject limitations upon the taxing power of Congress derived from such untenable criteria as "proprietary" against "governmental" activities of the States, or historically sanctioned activities of Government, or activities conducted merely for profit, and find no restriction upon Congress to include the States in levying a tax exacted equally from private persons upon the same subject matter.

*Id.* at 583-84, 66 S.Ct. at 315 (footnote omitted).

Justice Frankfurter's brethren in the majority refused to accept all of the views that he had offered. Even Justice Rutledge, who concurred in the opinion, felt a need to express himself separately. *Id.* at 584-86, 66 S.Ct. 310. Four other Justices, in an opinion by Chief Justice Stone, felt compelled to limit the *per se* "nondiscriminatory test" formulated by Frankfurter.

While joining Justice Frankfurter in finding "untenable the distinction between 'governmental' and 'proprietary' interests," *id.* at 586, 66 S.Ct. at 316, the Chief Justice expressed his reserva-

tions with regard to placing exclusive reliance upon the nondiscriminatory nature of a tax in the following words:

> [W]e are not prepared to say that the national government may constitutionally lay a non-discriminatory tax on every class of property and activities of States and individuals alike.
>
> . . . [O]ur difficulty with the formula, now first suggested as offerin a new solution for an old problem, is that a federal tax which is not discriminatory as to the subject matter may nevertheless so affect the State, merely because it is a State that is being taxed, as to interfere unduly with the State's performance of its sovereign functions of government.

*Id.* at 586–87, 66 S.Ct. at 316. The difficulty encountered by the Chief Justice and his colleagues with Frankfurter's formulation is evidenced by the following passage:

> If the phrase "non-discriminatory tax" is to be taken in its long accepted meaning as referring to a tax laid on a like subject matter, without regard to the personality of the taxpayer, whether a State, a corporation or a private individual, it is plain that there may be non-discriminatory taxes which, when laid on a State, would nevertheless impair the sovereign status of the State quite as much as a like tax imposed by a State on property or activities of the national government. Mayo v. United States, 319 U.S. 441, 447–448 [63 S.Ct. 1137, 1140, 87 L.Ed. 1504, 147 A.L.R. 761]. This is not because the tax can be regarded as discriminatory but because a sovereign government is the

taxpayer, and the tax, even though nondiscriminatory, may be regarded as infringing its sovereignty.

*Id.* at 587, 66 S.Ct. at 316. Thus, Chief Justice Stone concluded that the mere nondiscriminatory nature of a tax would not be enough to sustain its levy upon a state or locality. In addition, the Chief Justice indicated that "we [must] consider whether such a non-discriminatory tax unduly interferes with the performance of the State's functions of government. If it does, then the fact that the tax is non-discriminatory does not save it." *Id.* at 588, 66 S.Ct. at 317.

Returning, then, to the matter at bar, we reiterate that these distinctions are not determinative to the outcome of this case. Clearly, the excise tax imposed by § 4261 of the Code is nondiscriminatory in nature. All users of air transportation facilities (with the limited exception of an international organization or the Red Cross) are equally subject to this tax. We cannot perceive any undue interference with the sovereign functions of City government as the result of its being compelled to contribute to the federal tax coffers in this particular instance. While it is difficult for us to conceive of a federal tax, other than those suggested in the opinions of the Court (*i. e.*, a tax on statehouses and cityhalls), which is both nondiscriminatory and yet unduly restrictive against a municipality,[10] it is clear that the air transportation excise tax is neither discriminatory nor does it unduly interfere with the governmental functions of New York City. As one commentator has put it, "any challenge to federal taxation of a state [or city] activity would require a showing of actual impairment of

---

10. While perhaps not entirely satisfactory, we offer the following example to illustrate this concept: A federal tax on all .38 caliber handguns (or bullets). Such a tax would apply to all who own such pistols: private citizens, detective agencies, and the like, as well as state and local governments. However, owing to the fact that the incidence of .38

caliber handgun ownership is greatest among state and local law enforcement agencies and that the possession of such firearms is vital to their proper functioning, it might well be said that although nondiscriminatory in scope, the tax, if of sufficient magnitude, could indeed unduly interfere with the sovereign functions of government.

state [or city] functions." McCormack, *supra* n. 9 at 493. Plainly, no actual impairment of the City's functions has been demonstrated in this case.

The statutory exemption previously enjoyed by the City having been abrogated in 1970, we conclude that the constitutional doctrine of intergovernmental tax immunity will not properly assume its place. The City's claim of immunity from the excise tax imposed under § 4261 must be rejected. We add only that our view with regard to New York v. United States is fully supported by the following cases: Murphy v. O'Brien, 485 F.2d 671, 674–75 (T.E.C.A. 1973); United States v. Washington Toll Bridge Authority, 307 F.2d 330, 334 (9 Cir. 1962) (en banc), cert. denied, 372 U.S. 911, 83 S.Ct. 724, 9 L.Ed.2d 719 (1963); Texas v. United States, 72–2 U.S.Tax Cas. ¶ 16,048 at 86,128 (W.D. Tex.1972), aff'd mem., 73–1 U.S.Tax Cas. ¶ 16,085 at 81,394 (5 Cir. 1972);[11] Iowa State Univ. of Science & Technology v. United States, 500 F.2d 508, 523 (Ct.Cl.1974).

## CONCLUSION

The motion of the United States pursuant to Fed.R.Civ.P. 12(b)(6) is hereby granted. The Clerk of the Court shall enter judgment dismissing the complaint with prejudice and costs.

It is so ordered.

11. The decision of Judge Roberts in Texas v. United States squarely addresses the question of immunity for states and localities from the § 4261 tax. However, the Judge there placed emphasis upon the user charge aspect of the § 4261 levy, as contrasted with analyzing it as a true tax, and thus concluded that it was "as such . . . outside the scope of the doctrine of implied intergovernmental tax immunity." 72–2 U.S. Tax Cas. at 86,131. The Court went further and in what might be considered dictum recognized that

> Even if the airway user charge is considered to be a tax within the general

confines of the doctrine of implied intergovernmental tax immunity, plaintiff has not shown that the tax is invalid where it is nondiscriminatory, Congress specifically intended to tax this activity whether or not carried on directly by the State, and there exists no undue burden upon the performance of plaintiff's functions as a government which have long been recognized by the Constitution as sovereign. New York v. United States, *supra*.

As our discussion in the text *supra* indicates, we are in complete agreement with these views.