**BLAKE CONSTRUCTION CO., INC.**

v.

**The UNITED STATES.**

No. 274–73.

United States Court of Claims.

Feb. 22, 1978.

Gerald H. Sherman, Washington, D. C., for plaintiff; A. L. Suwalsky, Jr., and Silverstein & Mullens, Washington, D. C., of counsel.

Robert S. Watkins, Washington, D. C., with whom was Asst. Atty. Gen. M. Carr Ferguson, Washington, D. C., for defendant; Theodore D. Peyser, Washington, D. C., of counsel.

Before DAVIS, KASHIWA and KUN-ZIG, Judges.

## OPINION

PER CURIAM:

This case comes before the court on plaintiff's exceptions to the recommended decision of Trial Judge David Schwartz, filed March 31, 1977, pursuant to Rule 134(h), having been submitted to the court on the briefs and oral argument of counsel. Upon consideration thereof, since the court agrees with the trial judge's recommended decision, as hereinafter set forth *, it hereby affirms and adopts said decision as the basis for its judgment in this case. In adopting the trial judge's opinion, conclusion and findings, the court stresses that this taxpayer was a very closely held family corporation, not one with a substantial number of public stockholders or a wide diversification of ownership. That fact is essential to our decision. It is, therefore, concluded as a matter of law that plaintiff is not entitled to recover and the petition is dismissed.

## OPINION OF TRIAL JUDGE

SCHWARTZ, Trial Judge:

The first of the two issues in this suit for a refund of income tax is whether the expenses of a stable of thoroughbred racing and breeding horses were those of a "trade or business" under section 162 of the Internal Revenue Code, 26 U.S.C. § 162(a) (1970), or were personal expenses of the shareholders of the plaintiff. The second issue is whether $30,000 of the $90,000 salary paid in 1967 to each of the three executives of the plaintiff was reasonable compensation under § 162 or was rather a constructive dividend to stockholders. Both issues are on the facts found after trial decided against the taxpayer.

Plaintiff is a family corporation founded by Mr. Jack I. Bender in 1947 and engaged in general construction contracting, the ownership, management and development of real estate and related activities in and about the District of Columbia. It is a substantial company, with assets of over $100 million in the years involved, the fiscal years ending April 30, 1967 and 1968. Mr. Bender, who had been the chief executive officer, died on December 8, 1966, and his three sons, Morton A., Howard M. and Stanley S. Bender assumed exclusive control of the company, as working heads, officers and directors. At that time they each owned 15 percent of the stock, with most of the remainder in the hands of their father's testamentary marital trust. At the time of trial, the three brothers owned all of the stock.

Morton A. Bender, who had been his father's assistant and understudy, has been president from mid-1966, Howard M. Bender, the vice-president, attends to construction in the field, and Stanley S. Bender, the company's treasurer, sees to finance.

### I. The Stable of Horses as a Trade or Business In Plaintiff's Hands

■ Mr. Jack Bender had a long-time interest in thoroughbred horse breeding and racing. He shared ownership of a large breeding farm, Glade Valley Farms, Inc. in Frederick, Maryland, with a prominent veterinarian and horse breeder, Dr. Robert A. Leonard, and he owned a stable of 12 thoroughbred horses, called J.I.B. Farms, which he raced and bred. J.I.B. Farms is the subject of this issue. In most years Mr. Bender's tax returns, never in this respect challenged by the Internal Revenue Service, showed substantial losses from the operation of J.I.B. Farms:

| | | | |
|---|---|---|---|
| 1959 | ($ 7,840) loss | 1963 | ($60,621) loss |
| 1960 | ( 23,086) loss | 1964 | 5,698 profit |
| 1961 | ( 24,103) loss | 1965 | 3,237 profit |
| 1962 | ( 43,272) loss | | |

The stable of horses was sold by Mr. Bender to the plaintiff corporation on November 15, 1966. In that year his loss for the 11 months was $66,031.

Stanley Bender, acting for the plaintiff corporation, bought J.I.B. Farms from his father in November 1966 when the latter was in the hospital and both knew that he

---

* Whereas the court adopts the trial judge's separate findings of fact, which are set forth in his report filed March 31, 1977, they are not printed herein since such facts as are necessary to the decision are contained in his opinion.

would not recover. The sale was agreed during a short discussion between the two. Stanley later told his brothers and they concurred. The bill of sale, dated November 15, 1966, gives the price as $177,804. Mr. Bender then owed the plaintiff $121,851 on a note.

The price was set by a valuation of the horses by a nationally-known firm of horse appraisers. The senior Mr. Bender's adjusted basis for the horses at the time was almost $205,000 more than the sale price. Before continuing with the subject of the sale to plaintiff, it may here be added that the plaintiff held the horses for 3 years, considered liquidation throughout that time and sold the horses at auction in 1969 for $63,500. Claimed tax losses, from operations and on liquidation, were considerable.

Mr. Bender's motive in selling was to provide for the welfare of the horses. His will had provided that his executors could sell the horses to Glade Valley Farms, but only at book value. Presumably he knew that their value was so much less than book that Dr. Leonard, the surviving half-owner, would not be willing to buy them at that price. In any event Mr. Bender wanted to sell the horses so that they would not on his death pass into the custody and care of an estate. This was an important consideration for Stanley, too, in agreeing to buy the horses.

The purchase of a horse racing and breeding stable by the plaintiff corporation was within the powers allowed to the corporation by its charter. But withal it was somewhat inappropriate for a company involved in real estate. The plaintiff would not have bought anybody else's horses. The brothers were buying only their father's horses, but buying them for the corporation.

The stable would not have been as out of place for purchase by the brothers, individually, as it was for the corporation. The brothers own or have owned a radio station, a hotel, a retail store selling souvenirs of the Washington Redskins and various oil and gas properties. But those ventures they have engaged in for profit, and there were only losses to be expected from the horses they were buying to please their dying father.

Neither the purchase nor the operation by plaintiff of J.I.B. Farms was attended by any of the characteristics of a venture for profit, the hallmark of a trade or business. *Iowa State Univ. of Science & Technology v. United States*, 500 F.2d 508, 522, 205 Ct.Cl. 339, 361–62 (1974); *Patterson v. United States*, 459 F.2d 487, 493, 198 Ct.Cl. 543, 552–53 (1972); *cf.* § 269 I.R.C., 26 U.S.C. § 269 (1970). The purchase was made without consideration of any business aspects of stable ownership and no thought was given, after the purchase, to the possibilities of profit. None of the brothers was familiar with horse management. Yet no advice on horse ownership was sought and management of the horses was left to Dr. Leonard without direction or goals, or indeed, without it being conveyed to him that he was now in sole charge.

The brothers knew that their father had been active in the management of the stable and given it direction and control as to purchases, breeding, racing and disposition of horses, but they did not supply either interest, management or plan. None of them participated in the management of the stable in the 3 years in which their corporation owned the horses. In the opinion of Dr. Leonard, who testified as a witness, he would have managed it differently if he had been told he was in sole charge. He thought that the stable had a profit potential if someone had given it overall direction. But no one did.

The neglect of an enterprise does not disqualify it from deductibility of its expenses, but the neglect here shown corroborates the inference from the facts that the corporate purchaser was not buying a business but that the stockholders were doing a favor for their father.

Aside from the desire of the brothers to satisfy their father's concern for the welfare of his horses, there were significant tax aspects to acquisition by the corporation and not by the brothers individually. In view of the steady decline in the value of the horses, the sale whether to plaintiff or anyone else was inevitably to be a sale at a substantial loss. There were also steady losses to be expected, as in the past.

The senior Mr. Bender could not use such losses. He had substantial current operating losses in his various real estate partnership interests. Nor could the brothers individually use any losses. They, too, had such extensive losses on individual investments as made it unattractive to take over assets with existing or prospective losses.

But the plaintiff corporation could use losses, for it had plenty of income at the time. And while the loss suffered by Jack Bender on the sale of the horses to his family corporation could under section 267(a) of the Internal Revenue Code not be taken by the seller in the year of the sale, the plaintiff's accountant, who was also the family accountant, believed (and this belief the parties have agreed was erroneous) that the loss could under §267(d) be taken by the corporation upon a resale to an unrelated third party. Accordingly, on plaintiff's tax returns, the accountant increased the losses on horses disposed of to the extent of Mr. Jack Bender's unrecovered basis.

The expectation of losses on ultimate sale was fully realized. Their value declined steadily from Jack Bender's cost basis of $383,000 to the appraised sale price of $177,-804 and finally to the auction sale price of $63,500. The brothers considered liquidation of the horses during the entire period of plaintiff's ownership and actually decided to liquidate the stable when the plaintiff began in 1968 to sustain large losses.

In addition to the losses on the ultimate sale, so long as the plaintiff owned the horses there were to be expected substantial expenses and depreciation. These amounted, on plaintiff's tax return, to losses of $35,000 in the 5 months from the date of purchase, November 15, 1966, to the end of the corporate fiscal year on April 30, 1967, and $134,000 in plaintiff's next fiscal

year. Depreciation of such horses is considerable. The useful life for depreciation purposes of a racehorse is 5 years, and broodmares are depreciated through age 14. All of the horses acquired by plaintiff were depreciated on the basis of a 5-year useful life without regard to age or status—that is, whether they were racing stock or were used for broodmares.

There were thus tax motives for the purchase by the corporation, namely, first, the use of the annual losses of J.I.B. Farms to absorb profits of the plaintiff corporation and, second, the utilization of a $205,000 loss which was, or was believed to be, not useful to Jack Bender or to the brothers individually, but useful to plaintiff when plaintiff should resell the horses to an unrelated party. In Stanley Bender's words, the brothers considered the purchase a moving of the horses from one pocket to another.

The circumstances of the purchase and the subsequent treatment of the horses, set out in fuller detail in the accompanying findings of fact, are such as more than suggest that the three brothers caused the corporation to buy the horses, not as a business venture for profit or for the production of income but as an accommodation to their father, to make his mind easy as to the welfare of his horses, and as a means of utilizing tax losses which were of no use to their father and themselves as individuals. *Iowa State Univ. of Science & Technology v. United States, supra* ; *Patterson v. United States, supra* ; *cf.* § 269 I.R.C., 26 U.S.C. § 269 (1970). The horses having been bought and held for a combination of filial sentiment and tax reasons and not as a trade or business for profit, the claimed losses and deductions from their ownership and liquidation may not be recognized under sections 162 and 167(a) of the Internal Revenue Code.*

* It is possible that corporate losses deductible under I.R.C. § 165(a) need not be shown to be business or profit-related. *Cf. International Trading Co. v. Commissioner of Internal Revenue*, 484 F.2d 707 (7th Cir. 1973); *W.L. Schautz Co. v. United States*, 567 F.2d 373, 215 Ct.Cl. —— (decided Dec. 14, 1977). However, this taxpayer never raised this point through-

out these proceedings but has consistently agreed that it could not prevail if the court found that it had no intention or purpose to make a profit on the horses. Accordingly, we do not pass in this case on the lurking issue of non-business-profit losses under § 165(a). [footnote by the court].

## II. The Compensation Issue

The compensation issue arises from the circumstance that the three brothers as corporate officers set their salaries at $60,000 annually, but were inadvertently paid $90,000 in the corporation's fiscal year ending April 30, 1967. They each received $60,000 in each of the calendar years 1966 and 1967, but large payments in January and April of 1967 raised to $90,000 the total payment to each of them in the 12 months ending April 30, 1967. When the plaintiff in that fiscal year sought to deduct the whole $90,000 for each brother, the Commissioner disallowed $30,000, a total of $90,000 for the three brothers.

◼ The issue is the reasonableness of the payment of $90,000 as compensation, an issue to be determined on all the facts and circumstances. *Jones Bros. Bakery, Inc. v. United States*, 411 F.2d 1282, 1285, 188 Ct.Cl. 226, 231 (1969); *Boyd Constr. Co. v. United States*, 339 F.2d 620, 624, 168 Ct.Cl. 579, 586 (1964).

The sums paid to each brother, in the years 1967 through 1968, were these:

*1965*

| | | | |
|---|---|---|---|
| January | $18,000 | | |
| February | 1,250 | | |
| March | 1,000 | | |
| April | 1,000 | | |
| May | 1,250 | | |
| June | 1,000 | | |
| July | 1,000 | | |
| August | 1,250 | | |
| September | 1,000 | | |
| October | 1,250 | | |
| November | 1,000 | | |
| December | 21,000 | | |
| | | total, calendar year ending 1965 | $50,000 |

*1966*

| | | | |
|---|---|---|---|
| January | $ 1,250 | | |
| February | 1,000 | | |
| March | 1,000 | | |
| April | 18,000 | | |
| | | total, corp. fiscal year ending April 1966 | $50,000 |
| May | 1,250 | | |
| June | 4,000 | | |
| July | 1,000 | | |
| August | 18,250 | | |
| September | 1,000 | | |
| October | 1,250 | | |
| November | 1,000 | | |
| December | 11,250 | | |
| | | total, calendar year ending 1966 | $60,250 |

*1967*

| | | | |
|---|---|---|---|
| January | $31,000 | | |
| February | 1,000 | | |
| March | 1,000 | | |
| April | 18,000 | | |
| | | total, corp. fiscal year ending April 1967 | $90,000 |
| May | 1,250 | | |
| June | 1,000 | | |
| July | 1,250 | | |
| August | 1,000 | | |
| September | 1,000 | | |
| October | 1,250 | | |
| November | 1,000 | | |
| December | 1,000 | | |
| | | total, calendar year ending 1967 | $59,750 |

*1968*

| | | | |
|---|---|---|---|
| January | $48,250 | | |
| February | 1,000 | | |
| March | 1,000 | | |
| April | 1,250 | | |
| | | total, corp. fiscal year ending April 1968 | $60,250 |
| May | 1,000 | | |
| June | 1,000 | | |
| July | 1,250 | | |
| August | 1,000 | | |
| September | 1,250 | | |
| October | 1,000 | | |
| November | 1,000 | | |
| December | 1,250 | | |
| | | total, calendar year ending 1968 | $60,250 |

It will be noted that their salaries in calendar 1965 were $50,000 and in calendar 1966 and 1967 and 1968 were $60,000 or substantially so, and that their salaries in the corporation fiscal year 1966 were $90,000 and in the corporation fiscal year 1967 were $60,250. Thus salaries were the same in the corresponding calendar and corporation fiscal year, except that each was paid $60,000 in calendar 1966 and $90,000 in the corresponding corporation's fiscal year, the year ending April 1967:

| Calendar Year | | Corporation's Fiscal Year | |
|---|---|---|---|
| 1965 | $50,000 | 1966 | $50,000 |
| 1966 | 60,250 | 1967 | 90,000 |
| 1967 | 59,750 | 1968 | 60,250 |
| 1968 | 60,250 | | |

◼ Stanley Bender, in charge of finance for plaintiff, was well aware of the significance of the corporate fiscal year in connection with payment and deductibility of executive compensation. He had caused an $18,000 payment to be made to each of the

brothers in April of 1966, the previous year, so that the total intended salary would be paid and become deductible in the corporation's fiscal year. The payments of $90,000 instead of $60,000 in the fiscal year 1967 was a mistake, pure and simple. His mistaken payment to his brothers and himself of $30,000 more than was intended grew out of the custom of giving each brother, routinely, weekly checks on account of salary to a total of $1,000 or $1,250 per month and a larger check for any additional salary any one of them wanted to draw. Such a large sum—$31,000—had been paid to each brother in January 1967. In April, at the close of the corporation's fiscal year, Stanley Bender apparently overlooked the $31,-000 payment in January, and perhaps with the thought of repeating the payment of $18,000 in the previous year, caused a check for $18,000 to be drawn to each brother, bringing the total for each brother, in the corporation's fiscal year, to $90,000.

When the mistake was discovered, some months later, no steps were taken to rectify it, because, the brothers testified, they believed they were worth the $90,000 they had been paid. Their belief was and is based on the fact that they are often required to pledge their personal credit to obtain performance bonds on large construction contracts awarded to the plaintiff corporation by the Government. Although the corporation had assets of over $100 million in the years in question, bonding companies would either not issue bonds or would charge a higher premium, without the signatures of the three brothers as individual guarantors of the corporation's obligation. At the time of trial there was in force a bond for the performance by plaintiff of a $110 million project at Walter Reed Hospital. To obtain the bond, all three brothers had been required to give personal guarantees.

In the years in issue the brothers owned 45 percent of the stock of the plaintiff and had individual assets of $5 to $6 million each. They were the only stockholders so required to guarantee the plaintiff's bonds. The other stockholders—the marital trust, Mrs. Jack I. Bender and her brother, who owned a small amount of stock—were apparently inappropriate guarantors.

The foregoing was the total of the evidence on the subject of the reasonableness of the $30,000 compensation paid to each brother. There is no evidence in the record as to how much it is reasonable to pay, in addition to an already set salary of $60,000, as compensation for the brothers' pledge of personal fortunes of $5 million to faithful performance of their company's construction projects. *Tulia Feedlot, Inc. v. United States*, 513 F.2d 800, 807 (5th Cir.), *cert. denied*, 423 U.S. 947, 96 S.Ct. 362, 46 L.Ed.2d 281 (1975). Indeed, there is no evidence on the subject of the compensation reasonably to be paid for the services the brothers perform as executives of a construction contractor. The plaintiff introduced no evidence whatsoever on the compensation issue, other than the brothers' belief that they deserved the $90,000 paid them because they were required to lend their personal credit to the company.

It is quite possible that the brothers were each worth $90,000. It is quite possible that if they had decided to pay themselves $90,000 each as compensation for their work as executives and their pledges of their personal fortunes, evidence could be found to support the payment as reasonable. But it is hardly proof of their $90,000 worth that having decided to pay themselves $60,-000, they accidentally paid themselves $90,-000 and now state their post facto belief that they deserved it. It is easy to join with the Commissioner in believing that payment of a raise of $30,000 in the last days of the year by reason of lapse of memory as to bookkeeping and arithmetic is not to be respected as much as a deliberate decision to increase annual pay. *Cf. Henderson Tire & Rubber Co. v. Commissioner*, 12 BTA 716 (1928). If, as the brothers assert, they were worth $90,000, it would be expected that they would have originally voted to pay themselves $90,000, or at least paid themselves $90,000 in the following year, deliberately.

What seems to have happened is that the overpayment was simply not taken seriously in what was after all a corporation owned by the three people involved. That is just what distinguishes a constructive dividend to shareholder-executives—treatment of the corporation as a pocket of its executives. Stanley Bender's remark on the horse stable side of the case—that the change in ownership was a change from one family pocket to another—also sums up the $30,000 overpayment.

The record provides insufficient evidence to show affirmatively, as a taxpayer seeking to overturn the Commissioner must, that $60,000 or $90,000 or any other sum is reasonable compensation under § 162(a)(1) of the Code. *Lewis v. Reynolds*, 284 U.S. 281, 283, 52 S.Ct. 145, 76 L.Ed. 293 (1932); *Missouri Pacific R.R. Co. v. United States*, 338 F.2d 668, 671, 168 Ct.Cl. 86, 90 (1964). On this issue, too, the plaintiff taxpayer fails in its proof, and the complaint must therefore be dismissed.

### Conclusion of Law

Upon the foregoing opinion, the findings of fact and ultimate findings and conclusions, which the court adopts and which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is not entitled to recover, and the petition is dismissed.