MORES STEEL COMPANY, INCORPORATED, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Mores Steel Co. v. Commissioner
Docket No. 366-78.
United States Tax Court
T.C. Memo 1981-35; 1981 Tax Ct. Memo LEXIS 710; 41 T.C.M. (CCH) 782; T.C.M. (RIA) 81035; January 28, 1981. *710 Petitioner's receipts from certain construction jobs were deposited in a separate bank account. Petitioner's two 50-percent shareholder-officers withdraw equal amounts from this account. Neither the receipts nor the deposits nor the withdrawals were posted to petitioner's books. Petitioner concedes that the receipts are taxable to it. Held: (1) The deposits (or withdrawals) are not deductible as compensation (sec. 162(a)(1), I.R.C. 1954). (2) Respondent's determination of additions to tax under section 6653(a) (negligence) sustained. Robert N. Kolb, for the petitioner. Eugene H. Ciranni, for the respondent. CHABOT
MEMORANDUM FINDINGS OF FACT AND OPINION CHABOT, Judge: Respondent determined deficiencies in Federal corporate income tax and additions to tax under section 6653(a) [1] (negligence) against petitioner as follows: Addition to tax
Taxable Year Ended
Deficiency
section 6653(a)
September 30, 1971 [2] *711 $ 653
$ 33
September 30, 1974
$ 21,102
$ 1,055
The issues for decision are as follows: (1) Whether petitioner is entitled to compensation deductions for amounts deposited in (or withdrawn from (see note 9, infra)) a bank account by its two shareholder-officers. (2) Whether petitioner is liable for additions to tax under section 6653(a). FINDINGS OF FACT Some of the facts have been stipulated; the stipulation and the stipulated exhibits are incorporated herein by this reference. Petitioner is a corporation organized under California law.When the petition in this case was filed, petitioner's principal business office was in Concord, California. In 1964, Clifford Mores (hereinafter sometimes referred to as "Mores") and James Gonsalves (hereinafter sometimes referred to as "Gonsalves") formed a partnership called The Mores Steel Company. The purpose of the partnership was to engage in the construction business, fabricating and installing steel reinforcing rods in concrete structures. On October 8, 1965, petitioner was organized to continue the business of this partnership. All of petitioner's stock was owned in equal shares by *712 Mores and Gonsalves until about April 1972. From then until about November 1972, Mores and Gonsalves each owned 40 percent of petitioner's stock and the remaining 20 percent was owned by Maurice Moyal (hereinafter sometimes referred to as "Moyal"). About November 1972, Moyal's 20-percent share was repurchased by Mores and Gonsalves. Mores and Gonsalves continued to own all of petitioner's stock in equal shares until about December 1974, when Mores purchased all the stock in petitioner owned by Gonsalves. During all of the years in issue, Mores was the president and Gonsalves was the vice president of petitioner. Mores was chiefly responsible for making estimates and bids on construction projects in order to obtain contracts. He also was in charge of collecting receivables relating to completed contracts and was in charge of making steel purchases. During the early years of the business, Mores also performed actual construction work in the field, and worked 70 to 80 hours per week in order to do everything necessary to complete contracts. Gonsalves, while he was associated with petitioner, was primarily responsible for scheduling the work of petitioner's employees in the shop *713 and in the field, and for coordinating deliveries of materials from the shop to the field. He, too, during the early years of the business, performed actual construction work in the field and worked 70 to 80 hours per week. After Gonsalves left petitioner, Mores assumed Gonsalves' duties. Gonsalves was not replaced, but an additional estimator was hired to share Mores' estimating responsibilities. Mores' and Gonsalves' take-home pay was less than that of petitioner's union employees in the field during the first few years of the business, even though the union employees worked only 40 hours per week. During the years before the Court, Mores' and Gonsalves' salaries were almost identical to those of petitioner's other top employees. The salaries paid by petitioner to Mores and Gonsalves and reported as officers' salaries on its income tax returns were authorized in petitioner's board of directors' minutes. Petitioner reported officers' salaries on its Federal income tax returns as shown in table 1. Table 1 Taxable Year Ending In [3] *714 Officers' Salaries
1971
$ 39,740
1972
43,829
1973
46,852
1974
[4] 46,852
1975
39,740
For fiscal 1971 through fiscal 1974, Mores and Gonsalves divided equally the amounts shown in table 1. For fiscal 1975, Mores received $ 36,000 and Gonsalves received $ 6,000. [5]
Petitioner's first three directors were Mores, Gonsalves, and Lowell Christiansen (hereinafter sometimes referred to as "Christiansen"). Christiansen, a C.P.A., was petitioner's accountant from 1965 until the summer of 1970. Christiansen was replaced as petitioner's accountant by Moyal; however, Christiansen did not resign as a director even though he ceased to participate as a director after he was replaced as accountant by Moyal.Moyal was added to the board of directors. Meetings of petitioner's board of directors during 1970 through 1972 were held in Moyal's office. The corporate minutes were prepared and typed by Moyal or someone on his staff. Petitioner's corporate minute book and its general ledger *715 were kept in Moyal's office during the years he was petitioner's accountant.Thereafter the corporate minute book was kept in petitioner's office. Moyal, a public accountant, was petitioner's accountant from the time he replaced Christiansen in 1970 until he resigned in February 1973. In February or March 1974, Christiansen was rehired as petitioner's accountant.[6] Petitioner paid Christiansen on a retainer basis, at a rate of about $ 5,000 or $ 6,000 per year, before he was replaced by Moyal. Moyal was paid on a monthly retainer basis, at a rate of $ 200 or $ 300 per month. Petitioner's income tax returns were prepared by the people indicated in table 2. Table 2 Taxable Year Ending In
Preparer
Several years before 1970
Christiansen
1970 and 1971
Moyal
1972
Frank B. Gallan
1973
Unidentified
--Petitioner's bookkeeper
1974
Christiansen
During the years in issue, petitioner *716 always employed an office bookkeeper. The one who prepared petitioner's fiscal 1973 Federal income tax return had previously been employed by Moyal. Table 3 presents information from petitioner's Federal income tax returns. Table 3 Taxable Year Ending In
1971
1973
1974
Gross receipts
$ 788,966.25
$ 1,076,239.98
$ 1,791,389
Gross profit
214,201.28
273,106.91
433,251
Total assets
162,679.99
360,591.35
41,308 Petitioner maintained job cost cards on its jobs. All income and costs of material and labor for a particular job other than a small job (i.e., a job where petitioner's total contract price was less than $ 5,000) were posted to the job cost card for that job. Small jobs were treated the same way, except that the data on the small jobs were lumped together as "miscellaneous jobs". Job cost estimates were prepared for all jobs, but comparisons of actual costs with estimated costs were made only on larger jobs. The office bookkeeper maintained the job cost cards and job estimates. When Moyal was petitioner's accountant, he or a member of his staff did the bookkeeping with respect to the expenses of small jobs. Until 1968, almost all of petitioner's jobs were small jobs. By 1970, less than 25 *717 percent were small jobs. The number of small jobs performed by petitioner after 1970 varied greatly from year to year and could not be predicted in advance. On many of the small jobs, much of the labor was performed by Mores or Gonsalves on evenings or weekends. In theory, all of petitioner's sales receipts were to be posted to its general ledger. However, the gross receipts from small jobs were not posted to the ledger during fiscal 1972 through fiscal 1974.As a result, gross receipts were underreported on petitioner's Federal income tax returns in the amounts shown in table 4. Table 4 Taxable Year Ending In
Unreported Gross Receipts
1972 [7]
$ 20,511
1973
15,555
1974
38,232
All of these unreported gross receipts were deposited in a separate bank account at Central Bank (hereinafter sometimes referred to as "the Central Bank account"), which was opened late in 1971. However, all of the expenses relating to these small jobs were paid out of funds deposited in petitioner's regular bank account at Bank of America, which was the account to which gross receipts from large jobs *718 was deposited. All of the expenses relating to the small jobs were deducted on petitioner's Federal income tax returns. All withdrawals from the Central Bank account were made by Mores and Gonsalves in equal amounts. Between them, Mores and Gonsalves withdrew $ 14,369 and $ 45,980 from this account in fiscal 1973, and fiscal 1974, respectively. Only Mores and Gonsalves prepared and signed checks on the Central Bank account. Although the bookkeeper prepared all of petitioner's other checks, she did not prepare any checks written on the Central Bank account. Neither Mores nor Gonsalves reported these withdrawals as income on their Federal income tax returns for 1972 and 1973 (and, in Mores' case, 1974), as originally filed. Mores' Federal income tax returns for 1973 and 1974 were prepared by H&R Block and Company; Mores merely presented copies of his Forms W-2 and did not tell the preparer about the Central Bank account withdrawals. No written corporate minutes of petitioner anthorized establishment of the Central Bank account. No written resolution of petitioner's board of directors and nothing in its corporate minutes authorized the payment of additional salary, bonus, or compensation *719 to Mores or Gonsalves. None of petitioner's records (including payroll, Forms W-2, Forms 1099, or Federal income tax returns) evidenced payment to Mores and Gonsalves of any additional compensation during the years in issue. Mores and Gonsalves never agreed, as between themselves, on any specific amount of monthly, weekly, or other periodic additional bouns or salary. When Christiansen was rehired by petitioner as its accountant, he discovered the existence of the Central Bank account and advised petitioner's shareholders to contact an attorney immediately. They contacted Robert N. Kolb (hereinafter referred to as "Kolb"), the attorney representing petitioner in the instant case. Kolb, acting on behalf of petitioner, Mores, and Gonsalves, made a voluntary disclosure to the Internal Revenue Service of the omitted gross receipts shown in table 4, supra. On petitioner's Federal income tax return for its taxable year ended September 30, 1975, a Schedule M (relating to retained earnings) adjustment was made, indicating that deposits to the Central Bank account had inadvertently been omitted from petitioner's books and that petitioner would file amended returns reporting the deposits *720 as income. However, no amended returns were ever filed by petitioner. [8] Furthermore, acting upon Kolb's advice, Mores and Gonsalves filed amended Federal income tax returns for 1972 and 1973 wherein they reported as additional income the amounts they had withdrawn from the Central Bank account. With the amended income tax returns for 1972 and 1973, Mores and Gonsalves paid additional income taxes, "penalties", and interest to the Internal Revenue Service. Thereafter, the income tax returns of petitioner, Mores, and Gonsalves were audited by the Internal Revenue Service. The notice of deficiency issued to petitioner in the instant case resulted from this audit. Petitioner has never declared or paid a formal dividend with respect to its stock. The deposits in (or withdrawals from) the Central Bank account were not compensation for Mores' and Gonsalves' personal services. OPINION 1. Compensation Deductions
Petitioner concedes that the amounts deposited in the Central Bank account are includible *721 in its gross income, but argues that it is entitled to offsetting additional compensation deductions under section 162(a)(1) for the amounts deposited in (or withdrawn from) this account. [9] *722 Respondent argues that no additional compensation deductions are allowable, because the amounts deposited in (or withdrawn from) the Central Bank account are dividends. Respondent does not maintain that these amounts would be unreasonable if they were compensation. We agree with respondent that the amounts deposited in (or withdrawn from) the Central Bank account are not deductible as compensation. For an amount to be deductible under section 162(a)(1)[10] *723 the amount must be paid or incurred with the intent to compensate for personal services. Nor-Cal Adjusters v. Commissioner,503 F.2d 359, 362 (CA9 1974), affg. a Memorandum Opinion of this Court; [11]Kennedy v. Commissioner,72 T.C. 793, 801 (1979), on appeal (CA6 March 14, 1980); Paula Construction Co. v. Commissioner,58 T.C. 1055, 1058 (1972), affd. without opinion 474 F.2d 1345 (CA5 1973). Whether this intent has been demonstrated is a factual question to be decided on the basis of the particular facts and circumstances of the case. Nor-Cal Adjusters v. Commissioner,503 F.2d at 362; Kennedy v. Commissioner,72 T.C. at 801; Paula Construction Co. v. Commissioner,58 T.C. at 1059. The burden of proof is upon petitioner to demonstrate this intent. Welch v. Helvering,290 U.S. 111 (1933); Nor-Cal Adjusters v. Commissioner,supra;Rule 142(a), Tax Court Rules of Practice and Procedure.
Because Mores and Gonsalves, with respect to whom the deductions are claimed, were in complete control of petitioner's affairs, careful scrutiny is required in order to determin whether the deposits (or withdrawals) were payments of compensation. Logan Lumber Co. v. Commissioner,365 F.2d 846, 851 (CA5 1966), affg. on this issue a Memorandum Opinion of this Court; [12]Miles-Conley Co. v. Commissioner,173 F.2d 958, 960 (CA4 1949), affg. 10 T.C. 754 (1948); Kennedy v. Commissioner,72 T.C. at 803; Levenson & Klein, Inc. v. Commissioner,67 T.C. 694, 711 (1977). Many factors are relevant in determining whether amounts paid were reasonable compensation, but no single factor is decisive; rather, we must consider and weigh the totality of facts and circumstances in arriving at our decision. Mayson Mfg. Co. v. Commissioner,178 F.2d 115, 119 (CA6 1949), revg. *724 an unreported Memorandum Opinion of this Court. The following indicia of "dividends" appear in the instant case: (1) Petitioner did not deduct the deposits (or withdrawals) on its Federal income tax returns. (2) Mores and Gonsalves raised no question with their accountants and their bookkeeper about the inadequacy of their Forms W-2, even though they must have realized that the Central Bank account deposits (or withdrawals) were not reflected on these Forms. Pointing toward "compensation" is the fact that respondent does not deny that the amounts involved would have been reasonable compensation if they had been compensation. In the instant case, the following factors, often useful indicators in other cases, do not point clearly toward compensation or dividends: (1) Mores and Gonsalves shared equally in the Central Bank account. This is proportionate to their shareholdings and also proportionate to their formally declared salaries. (2) The amounts deposited in the Central Bank account depended on the happenstance of the volume of small jobs; they were unrelated to petitioner's profitability and also unrelated to the quantity or quality of Mores' and Gonsalves' services. (3) No *725 formal steps were taken to authorize the payments of either dividends or additional compensation to Mores and Gonsalves. Much suspicion is generated by the establishment of the Central Bank account at a separate bank, the fact that only Mores and Gonsalves prepared checks withdrawing amounts from this account, the disappearance of this category of receipts and disbursements from petitioner's regular accounting system (especially in view of Mores' testimony that virtually all of petitioner's business had been small jobs as recently as three years before the Central Bank account was established), and the "interesting" tax consequences of the procedures that had been followed before Christiansen discovered the account. However, respondent has not asserted tax fraud, and petitioner has not asserted theft losses. Although the matter is not free from doubt, we conclude on the basis of the record in the instant case that the Central Bank account moneys did not represent compensation for personal services to Mores and Gonsalves. Petitioner relies on Mores' and Gonsalves' testimony that they agreed, at the time the Central Bank account was established, to use it as a source of funds from *726 which to pay themselves additional compensation. We find their testimony more puzzling than clarifying. Since they saw to it that corporate minutes authorized their salaries, why would they have omitted having corporate minutes authorize such additional compensation?Mores testified that petitioner did not formally increase his and Gonsalves' salary because the "bank sometimes stipulates that you cannot get a raise unless you get authorization from them, if you have any loans by them." Yet Mores steadfastly denied that the Central Bank account was established to hide from petitioner's creditor banks any increase in compensation to himself and Gonsalves. Since they received this additional income in significant amounts (compare tables 1 and 4, supra), why would they have consistently omitted these amounts from income on their individual income tax returns? Since the asserted purpose of the arrangement was to provide additional income, why did Mores at first testify that he had never received any of the Central Bank account funds? If they believed they were entitled to additional compensation, why would they have established so bizarre a method--unpredictable in amount and unrelated *727 to their efforts--of determining the amount of the compensation? Since petitioner's bookkeeper commonly prepared petitioner's other checks (including, presumably, Mores' and Gonsalves' salary checks), why did Mores and Gonsalves write all the checks drawn on the Central Bank account? Mores and Gonsalves testified that petitioner's accountant, bookkeeper, and office manager all were aware of the Central Bank account, that the Central Bank account was in petitioner's name, and that all the statements and cancelled checks of that account were mailed to petitioner's office. Yet, petitioner offered no witnesses to explain how a record-keeping system sufficient for a business of petitioner's size and complexity (see table 3, supra) ignored the Central Bank account for three years. As we stressed in Paula Construction Co. v. Commissioner, supra,58 T.C., 1059-1060, the critical point is the intent of the parties when the payments were made and not the intent manifested after a problem arises. Afterthoughts will not suffice in this area of the Internal Revenue Code (see Blake Const. Co., Inc. v. United States,215 Ct. Cl. 807, 572 F.2d 820, 825-826 (1978)), as in other areas (see Stevens Bros. Foundation, Inc. v. Commissioner,39 T.C. 93, 114-115 (1962), *728 affd. on this point 324 F.2d 633, 640 (CA8 1963)). Petitioner cites a number of opinions for legal propositions which we do not dispute. We have examined these opinions and conclude that all are consistent with the approach we take and the conclusion we reach on the record in the instant case. On this issue we hold for respondent. 2. Additions to Tax
Petitioner argues that the entire record substantiates its position that the additions to tax under section 6653(a) are not appropriate. Respondent argues that petitioner offered no evidence on the issue and that the failure of petitioner to report the small jobs income clearly constituted negligence. We agree with respondent. Petitioner has the burden of proving error in respondent's determination that additions to tax should be imposed under section 6653(a).[13] *729 Bixby v. Commissioner,58 T.C. 757, 791-792 (1972). Our examination of the record leaves us convinced that petitioner has not presented any adequate explanation for its failure to report all of its construction income. Deductions were claimed with respect to an entire group of jobs with respect to which not a single dollar of income was reported. On this issue we hold for respondent. Decision will be entered for the respondent. Footnotes
1. Unless indicated otherwise, all section references are to sections of the Internal Revenue Code of 1954 as in effect for the taxable years in issue.↩
2. The asserted deficiency for fiscal 1971 arises solely from a disputed adjustment to fiscal 1973's net operating loss, which affects the amount that may be carried back to and deducted for 1971.
3. During the period before the Court, petitioner's taxable years ended on September 30. 4. The stipulated tax return shows $ 46,852. Another stipulated exhibit shows $ 43,829, but the arithmetic on the latter exhibit is consistent with the $ 46,852 we have found.↩
5. So stipulated. The parties have not reconciled the fiscal 1975 total of $ 42,000 with the stipulated $ 39,740 shown in table 1.↩
6. The parties have stipulated that Christiansen was rehired in calendar 1975. Our finding, contrary to this stipulation, is based on (1) Mores' testimony and (2) the parties' stipulation that Christiansen prepared petitioner's fiscal 1974 return (table 2, infra↩), which was dated December 16, 1974, and filed December 19, 1974.
7. The parties have stipulated that the statute of limitations has run as to fiscal 1972; however, see section 6214(b).↩
8. Petitioner claims that its taxable income is not increased (despite the increase in its gross income) because it is entitled to offsetting compensation expense deductions. See note 9, infra.↩
9. On petition, petitioner claimed additional compensation deductions of $ 15,555 and $ 45,980 for fiscal 1973, and fiscal 1974, respectively. The amount so claimed for fiscal 1973 is the amount deposited to the account in that year, and the amount so claimed for fiscal 1974 is the amount withdrawn from the account in that year. The parties have stipulated that petitioner claims deductions for the withdrawals for both years ($ 14,369 for fiscal 1973 and $ 45,980 for fiscal 1974). This was petitioner's position at trial. On brief, at one point petitioner adheres to its stipulated position, but at other points petitioner "concedes" that the amounts claimed for fiscal 1973 and fiscal 1974 are $ 15,555 and $ 38,232, the respective amounts deposited in the account in these years. See table 4, supra.↩
10. SEC. 162. TRADE OR BUSINESS EXPENSES. (a) In General. -- There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including -- (1) a reasonable allowance for salaries or other compensation for personal services actually rendered; ↩
11. T.C. Memo. 1971-200↩.
12. T.C. Memo. 1964-126↩.
13. SEC. 6653. FAILURE TO PAY TAX. (a) Negligence or Intentional Disregard of Rules and Regulations With Respect to Income or Gift Taxes. -- If any part of any underpayment (as defined in subsection (c)(1)) of any tax imposed by subtitle A * * * (relating to income taxes * * *) is due to negligence or intentional disregard of rules and regulations (but without intent to defraud), there shall be added to the tax an amount equal to 5 percent of the underpayment. [The subsequent amendment of this provision by sec. 101(f)(8) of the Crude Oil Windfall Profit Tax Act of 1980 (Pub. L. 96-223, 94 Stat. 253) does not affect the taxable years before us.]↩