CORE SPECIAL PURPOSE FUND, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
CORE Special Purpose Fund v. Commissioner
Docket No. 20862-80.
United States Tax Court
T.C. Memo 1985-48; 1985 Tax Ct. Memo LEXIS 585; 49 T.C.M. (CCH) 626; T.C.M. (RIA) 85048; January 30, 1985
*585 P is an organization exempt from taxation under sec. 501(c)(3), I.R.C. 1954. P derived unrelated business income from the sale of advertising space in its two magazines and incurred expenses in the telephone solicitation of the advertising and in the publication of the magazines. Held, P has failed to prove that certain expenses which it deducted in calculating its unrelated business taxable income were incurred, or if incurred, were "directly connected with" its unrelated advertising activity within the meaning of sec. 512(a), I.R.C. 1954. However, P is entitled to deduct a portion of its claimed legal and accounting fees and telephone expenses under the rule of Cohan v. Commissioner,39 F.2d 540 (2d Cir. 1930). Raymond G. Leffler, for the petitioner. Kevin C. Reilly, for the respondent. SIMPSON
*627 MEMORANDUM FINDINGS OF FACT AND OPINION SIMPSON, Judge: The Commissioner determined a deficiency of $179,880.00 in the petitioner's Federal income tax for its short tax year of June 1, 1976, through December 31, 1976. The only issue for decision is whether the petitioner, an exempt organization, is entitled to any deductions for expenses in computing its unrelated business taxable income *586 attributable to the sale of advertising in its magazines. FINDINGS OF FACT Some of the facts have been stipulated, and those facts are so found. The petitioner, CORE Special Purpose Fund (the fund), had its principal place of business in New York, N.Y., at the time it filed its petition in this case. The fund filed its exempt Organization Business Income Tax Return (Form 990-T) for its short tax year of June 1, 1976, through December 31, 1976 (the short year), with the Internal Revenue Service. The fund also filed a Return of Organization Exempt from Income Tax (Form 990) for that short tax year. *3 The fund, an unincorporated association under the laws of the State of New York, is affiliated with the Congress of Racial Equality, Inc. (CORE). CORE was organized in 1961 for the purpose of eliminating racial discrimination by non-violent methods in places of public accommodation, education, employment, housing, voter registration, and related fields. Prior to 1967, the Commissioner determined that CORE was exempt from tax as a civic organization described in section 501(c)(4) of the Internal Revenue Code of 1954. [1] The fund was formed in 1967 to conduct various charitable and educational *587 functions and was determined, in that year, to be an organization described in section 501(c)(3). In 1973, the Commissioner further determined that the fund was not a private foundation because it was an organization described in section 509(a)(3). Roy Innis was the national chairman and national director of CORE and the chairman of the board of trustees of the fund in 1976 and at the time of trial. The fund's principal place of business during the short year was in an office which it shared with CORE located at 200 West 135th Street in New York City. The fund and CORE also shared an office in Baltimore and two offices in Los Angeles. *4 During the period at issue, the fund engaged in a variety of activities which were grouped by it for accounting purposes into four programs: (1) community services; (2) professional education and training; (3) public education; and (4) special projects. According to the fund's "Annual Report-Charitable Organization" (annual report) filed with the New York State Board of Social Welfare, the fund engaged in program activities, and incurred total *588 program expenses, as follows during the period: *5 Program
Total Program Expenses
(1) Community Services
[2] $ 367,270
- Community Referral
- Day Care Center
- Prison Reform
- Job Bank
- Housing
- Employment Referral
(2) Professional Education and
426,481
Training
- Editorial Program
- Fashion Self Awareness
- Operation Self-Help
- CORE Publications
(3) Public Education
237,699
- Tutorial Reading
- Media Communication
(4) Special Projects
377,410
- Data Processing Program
- Youth Outreach Program
- Senior Citizens Program
- Personal Development and
Sales Training Program
Total
$1,408,860 The annual report further states that the fund incurred fund raising and general administration expenses totalling $924,397. The fund and CORE employed Ross, Stewart & Benjamin, P.C. (Ross, Stewart), a public accounting firm, during 1976 and 1977. Ross, Stewart billed the organization $7,200 during the period in issue for accounting and auditing services. However, there is no evidence of record indicating the portion of such services attributable to each of the organizations or to *589 each of the fund's many programs. *6 Ross, Stewart audited the books and records of the fund and of CORE before it prepared the annual report and the organizations' tax returns for the period in issue. In the course of the audit, Ross, Stewart found certain irregularities in the organizations' financial practices. Chief among these defects was the issuance of an undue number of checks to "cash." In preparing the annual report, Ross, Stewart allocated some (unspecified) expenses directly to certain (unspecified) operating accounts. Salaries, employee benefits, and the remaining expenses were allocated among the various programs on the basis of the estimated time which the officers and employees of the fund devoted to each of the programs.However, in making such allocation, Ross, Stewart relied upon a percentage estimate of the employee's time furnished by the fund's management; the accountants did not independently verify the accuracy of the percentage estimate or the actual existence of the program activities. Ross, Stewart used the information contained in the annual report in preparing the fund's Forms 990 and 990-T. The fund published two magazines, "CORE Magazine" and the "Equal *590 Opportunity Employment Journal," as a part of the professional education and training program. As a result of an earlier audit of the fund's Form 990 for 1971, the *7 Commissioner had determined that revenue derived from advertising placed in the fund's magazines was unrelated business income within the meaning of sections 512 and 513. CORE Magazine" is a periodical that attempts to inform CORE's constituency and the public about critical issues affecting the poor, blacks, and other minorities. The magazine consists largely of articles, but it also contains a multiple-page insert of advertisements. Typically, several different inserts were printed for each issue of the magazine; each version of the insert contained only the advertisements of businesses in the States surrounding one of the fund's sales offices. Inserts may not have been included in all copies of "CORE Magazine." They may have been included only in copies of the magazine sent to advertisers. The press run for an insert ranged from 750 to 3,000 copies, whereas the press run for "CORE Magazine" varied from 10,000 to 20,000 copies. The "Equal Opportunity Employment Journal" contained primarily advertisements and a small *591 amount of editorial material, bound together in a cover. During the period in question, the fund published three issues of "CORE Magazine" and nine editions of the "Equal Opportunity Employment Journal." About a dozen professional employees and trainees were engaged in the writing, editing, and lay-out of the magazines, but there is no evidence in the record regarding the number of hours that each employee worked or the amount *8 of money that each was paid. These employees worked in the fund's New York office. The magazines were printed by Karr Graphics Corporation (Karr Graphics) of New York City. Karr Graphics also billed CORE for other items that it printed during the period at issue, including letterheads, envelopes, invoices, a fashion show booklet, and a book entitled "Profiles in Black." The bulk of the advertising placed in the magazines was sold over the telephone by salespersons operating out of the fund's four offices. The fund also solicited contributions in the same manner. In August 1976, CORE and its officers were named as defendants in a suit brought by the Attorney General of New Jersey charging the organization and its officers with the improper solicitation of *592 contributions. Specifically, the lawsuit alleged that the fund's telephone salespersons solicited advertising for "CORE Magazine" inserts and the "Equal Opportunity Employment Journal" by representing themselves as employees of a Federal or State equal employment opportunity commission and by using harassment and intimidation, among other methods. The New Jersey litigation was ultimately resolved through a consent judgment under which CORE admitted no unlawful act but did consent to comply thereafter with certain guidelines in soliciting contributions and advertising. *9 CORE retained New York attorney David Rozenholc to assist it in the New Jersey litigation and in other matters. Of the hours in 1976 during which he was employed by CORE, Mr. Rozenholc devoted about 50 percent of his time to the New Jersey litigation and about 40 percent to a "squatter" proceeding brought against CORE by the landlord of the New York office shared by CORE and the fund. In November 1976, Mr. Rozenholc billed CORE for $12,000 (300 hours at $40 per hour), but the invoice did not specify the hours attributable to each of these two cases. Mr. Rozenholc also billed CORE separately in July 1976 for representing *593 two CORE members in criminal actions unrelated to the magazines; the fee for such matters was $600. In 1978, CORE and the fund were investigated by the New York Attorney General after his office received numerous complaints about the organizations' methods of soliciting contributions for fund programs and advertisements for "CORE Magazine" and the "Equal Opportunity Employment Journal." Aaron Rubin, an associate accountant in the Attorney General's office, was assigned to audit the books and records of CORE and the fund for the years 1975 through 1977. A subpoena duces tecum was served on CORE ordering it to turn over all of its books and records (including those of the fund) for the 3 years, but CORE delivered only those records relating to its New York office and its short years of January 1 through May 31, 1976, and June 1 through *10 December 31, 1976. Mr. Rubin later subpoenaed the work papers of Ross, Stewart in order to investigate the finances of all of CORE's offices, but he was eventually only able to audit CORE and the fund's operations for 1976. Mr. Rubin's audit was directed primarily at uncovering any misallocation of expenses between the fund's programs and any expenditure *594 of its funds for the personal purposes of Mr. Innis, his family, and other members or employees of CORE. As a result of his examination, Mr. Rubin determined that the fund allocated expenses in a manner which artificially inflated its program expenses and reduced its fund raising and administrative expenses. He also discovered a lack of substantiation for some expenses, an undue number of checks issued to "cash," the expenditure of unusually large sums of money for hotels, expensive restaurants, and airlines, and the misuse of credit cards and checks for the personal expenses of Mr. Innis, his wife, and other CORE officers and employees. Eventually, the New York Attorney General's investigation of CORE and the fund was settled with no admission of violation of law by CORE or the fund. Among other things, the organizations agreed to maintain complete and adequate books and records, to impose controls on the use of credit cards and checks written to "cash," and to *11 accurately allocate expenses among accounts. Mr. Innis also agreed, without admission of wrongdoing, to give CORE $35,000. All of the books, records, and original documents (checks, invoices, etc.) subpoenaed by the New *595 York Attorney General were returned to CORE in July 1978, with the exception of the fund's cash receipts and disbursements journal and general ledger for June through December 1976, the fund's payroll journal for 1976, and the CORE Publications-A cash receipts and disbursements journal for June through December, 1976. Subsequently, at least the fund's cash receipts and disbursements journal was returned to it. Some of the other documents may have been delivered to the United States Attorney for the Southern District of New York, who was also investigating CORE, its affiliates, and officers; eventually, the Commissioner secured the CORE Publications-A cash receipts and disbursements journal from the United States Attorney, along with accountant's work papers that the United States Attorney had subpoenaed from CORE and the fund's accountants, Ross, Stewart. The fund utilized the accrual method of accounting in preparing its Forms 990 and 990-T for its short tax year June 1, 1976, through December 31, 1976. On its Form 990, the fund reported total receipts of $2,282,747, consisting of gross contributions of $1,878,872 and gross advertising income of $403,875. On its Form 990-T, the *596 fund reported *12 gross advertising income of $403,875 and direct advertising costs of $430,637, resulting in an advertising loss of $26,762. The fund determined that it had no unrelated business taxable income and owed no tax for the period. A breakdown of the direct advertising expenses deducted on the fund's Form 990-T appears on its Form 990 as follows: Salaries and wages
$ 96,017
Rent
11,921
Depreciation
2,685
Professional Fees
64,481
Supplies
6,172
Telephone
155,896
Postage and shipping
31,223
Rental and maintenance--
equipment
10,964
Travel
6,602
Conferences, conventions,
meetings
16,405
Materials
3,952
Utilities
5,484
Advertising and sales promotion
2,481
Insurance
448
Security
3,383
Bad debt expense
241
Office expense
622
Miscellaneous expense
8,145
Maintenance of building
2,630
Membership dues and
subscriptions
885
Total expenses
$430,637 In his notice of deficiency dated August 20, 1980, the Commissioner disallowed all of the claimed deductions for lack of substantiation. However, in his brief, he has conceded that the fund is entitled to a deduction of $32,098.55 for printing expenses (claimed as "professional fees" on the return) incurred in publishing "CORE Magazine," *13 inserts, and the "Equal Opportunity Employment *597 Journal," and for which expenses Mr. Karr of Karr Graphics presented invoices at trial. On October 20, 1981, the Commissioner served the fund with interrogatories and a request for production of documents. Among the documents requested of the fund were "Originals or copies of all books, records, financial statements, bills, receipts, cancelled checks, invoices or other documentation which would tend to substantiate" the advertising expenses allegedly incurred by the fund, its cash receipts and disbursements journal, an analysis of its travel and entertainment expenses, and copies of its board meeting minutes for the period in issue. When the fund failed to respond to such requests, this Court granted the Commissioner's motion for an order compelling the fund to respond to both requests on or before May 21, 1982. The fund then answered the interrogatories and supplied the Commissioner with its cash receipts and disbursements journal and board meeting minutes. We found the fund's response to the interrogatories and to the request for the production of documents to be evasive and incomplete, and consequently, by order dated October 20, 1982, we imposed sanctions pursuant to Rule 104(c), Tax Court Rules of Practice and Procedure. *598 [3]
*14 Such sanctions prohibited the fund from introducing at trial any documentary evidence included in the Commissioner's request for production of documents other than the documents that the fund had previously produced. Furthermore, the fund was prohibited from offering any evidence at trial concerning (1) bank accounts maintained by it in 1976, (2) travel and entertainment expenses (including meals) incurred by it in 1976, and (3) allowable deductions for depreciation except with respect to office equipment and automobiles. OPINION The sole issue for decision in this case is whether the fund, an exempt section 501(c)(3) organization, is entitled to any business expense deductions (beyond certain printing expenses conceded by the Commissioner on brief) in computing its unrelated business taxable income for its short tax year of June 1, 1976, through December 31, 1976. Section 511(a)(1) imposes a tax on the unrelated business taxable income of most exempt organizations, including organizations described in section 501(c)(3). "Unrelated business taxable income" is defined as "the gross income derived by *599 any organization from any unrelated trade or business (as defined in section 513) regularly carried on by it, less the deductions allowed by this chapter which are directly connected with the carrying on of such trade or *15 business." [4] *600 Sec. 512(a)(1). To be "directly connected with" the conduct of the unrelated business, an item of deduction must have a proximate and primary relationship to the carrying on of that business. Sec. 1.512(a)-1(a), Income Tax Regs.; see Iowa State University of Science and Technology v. United States,205 Ct. Cl. 339, 500 F.2d 508 (1974). Expenses, depreciation, and similar items attributable solely to the conduct of an unrelated business are proximately and primarily related to that business and therefore qualify for deduction to the extent that they meet the requirements of section 162, section 167, or other relevant provisions of the Internal Revenue Code. Sec. 1.512(a)-1(b), Income Tax Regs.
Where facilities or personnel are used both to carry on exempt activities and to conduct an unrelated trade or business, the expenses, depreciation, and similar items attributable to such facilities or personnel (as, for example, items of overhead) must be allocated between the two uses on a reasonable basis. The portion of any such item so allocated to the unrelated trade or business is proximately and primarily related to that business and is allowable as a deduction in computing unrelated business *16 taxable income in the manner and to the extent permitted by the relevant provision of the Code. Sec. 1.512(a)-1(c), Income Tax Regs.; see Disabled American Veterans v. United States,704 F.2d 1570 (Fed. Cir. 1983); Rensselaer Polytechnic Inst. v. Commissioner,79 T.C. 967 (1982), affd. 732 F.2d 1058 (2d Cir. 1984). The regulations also provide specific guidelines for calculating unrelated business taxable income where the income is derived from the sale of advertising in a periodical which contains editorial material related to the accomplishment of the organization's exempt purpose. Sec. 1.512(a)-1(d), (f), Income Tax Regs.[5] *602 However, *601 these specific advertising regulations cannot be applied in the present case: first, because the issue of whether the fund's publication of the readership content of the magazines is an exempt activity has not been decided, stipulated to, or presented for decision; and second, because the Commissioner has not sought to apply such *17 regulations, maintaining that they cannot be applied due to the fund's failure to produce credible evidence of its advertising and publishing expenses. [6] Consequently, the Commissioner seeks only to apply the more general allocation requirements of section 1.512(a)-1(c), Income Tax Regs. The Commissioner has disallowed all of the deductions claimed by the fund as advertising expenses (with the exception of certain printing expenses) because he maintains that the fund has failed to adequately substantiate that the expenses were incurred, or if incurred, that they were deductible under the applicable Code provision (section 162, 167, etc.) and that they were "directly connected with" the fund's unrelated *603 advertising activities. The fund maintains that it has adequately substantiated all of the deductions at issue (with the exception of those on which it was prohibited from presenting any evidence by our order imposing sanctions) through trial testimony. The fund also raises two alternative contentions that we shall address first. *18 The fund's first contention is that if its proof is lacking, it is due to the fact that it was hindered by other litigation from presenting supporting documentation during the Commissioner's audit and pre-trial discovery. The fund has the burden of proving at trial or through stipulation that it is entitled to each of the deductions claimed on its return. [7] Rule 142(a); Welch v. Helvering,290 U.S. 111, 115 (1933). As an exempt organization, the fund is also obligated to keep such permanent books of account and records as are sufficient to establish the gross income and deductions attributable to its unrelated business activity. Sec. 1.6001-1(a), (c), Income Tax Regs. The fund now asks us to excuse any insufficiency in its proof by claiming that it was unable to supply such books and records because third parties had taken possession of them during *604 the course of other litigation. *19 This Court has previously provided the fund with ample opportunities to raise this objection during discovery and, upon a full consideration of such objection, we have rejected it and have imposed sanctions upon the fund for failing to comply adequately with our discovery *605 order. Under such sanctions, the fund was prohibited from introducing any documentary evidence included in the Commissioner's request for the production of documents, with the exception of the fund's cash receipts and disbursements journal and board meeting minutes, documents that it had produced. We refuse to permit the fund to relitigate the imposition of such sanction. However, we do observe that the New York Attorney General's office returned the original, supporting documents--such as cancelled checks, bills, and invoices, but not certain journals--that it had obtained from CORE and the fund, prior to the issuance of the deficiency notice and well before the issuance of our discovery order. The fund has identified neither the still-missing documents nor the third parties purportedly in possession of such documents, and has not explained why it did not retain or obtain copies of such documents. We also observe that the fund failed to introduce its cash receipts and disbursements journal at trial even though this document was excepted by our sanctions, was available in the courtroom, and might well have aided the fund in the presentation of its case. *20 The fund's second alternative *606 contention is that its accountants' independent audit of its books and records prior to preparing its annual report, which report provided the basis for the preparation of the fund's tax return, is, in itself, a sufficient basis for allowing the expenses claimed on the return. The fund has not cited any legal authority in support of this novel proposition. It is well established that statements contained on a tax return are neither evidence nor proof of the facts asserted therein. Davis v. Commissioner,674 F.2d 553 (6th Cir. 1982), affg. a Memorandum Opinion of this Court; Seaboard Commercial Corp. v. Commissioner,28 T.C. 1034 (1957); Halle v. Commissioner,7 T.C. 245 (1946), affd. 175 F.2d 500 (2d Cir. 1949). Furthermore, while bookkeeping entries may be evidence of an expenditure, they are not controlling where other evidence indicates that the actual facts are to the contrary ( Doyle v. Mitchell Bros. Co.,247 U.S. 179 (1918); W.L. Moody Cotton Co. v. Commissioner,2 T.C. 347 (1943), affd. 143 F.2d 712 (5th Cir. 1944)), and they are never determinative of the deductibility of the expenditure (see Helvering v. Midland Mutual Life Ins. Co.,300 U.S. 216 (1937); Allen v. Commissioner,117 F.2d 364 (1st Cir. 1941), *607 affg. a Memorandum Opinion of this Court). The fact that the fund's accountants audited its books and records prior to preparing an annual report summarizing its net worth, income, and expenses, cannot make the contents of such report, or any *21 tax return based thereon, conclusive proof of the fund's tax liability. It is the duty of this Court to determine the tax liability of the fund based upon the evidence in the record before us; the opinion of the fund's accountants with respect to the existence or deductibility of expenditures cannot be substituted for our examination of the evidence. Even if we were to accept the more limited proposition that audited financial statements may under certain circumstances be evidence of the existence of expenditures in the amounts and for the purposes asserted therein, there are several reasons why the annual report involved in the present case is neither helpful nor reliable in substantiating the deductions at issue. First, the annual report does not show how direct and indirect expenses of a particular program (for example, the professional education and training program) were allocated among the various activities of the program. In order *608 to be deductible from the fund's unrelated advertising income, each expenditure must be "directly connected with" such advertising activity. Without the benefit of the accountants' work papers, we are unable to determine whether the various expenses attributed to the professional education and training program are properly allocable to the unrelated advertising conducted under that program. *22 Furthermore, the separate audit of CORE and the fund's books and records conducted by Mr. Rubin of the New York Attorney General's office has raised serious questions about the reliability of the expense figures contained in the annual report. Mr. Rubin discovered that the fund lacked substantiation for some expenses and that the fund's method of allocating indirect (overhead) expenses among programs caused fund raising expenses to be attributed to programs, thus artificially raising program costs while lowering fundraising costs. He was also of the opinion that an unusually large number of checks were written to "cash" (an opinion shared by the fund's own accountants) and that large sums of money were expended for the personal expenses of Mr. Innis and other CORE and fund officers and employees. *609 Such serious flaws in the fund's recordkeeping and accounting methods and operations strongly suggest that some expenses listed in the annual report and allocated to the fund's magazine-publishing activity are not properly deductible from the fund's unrelated advertising income. Therefore, we cannot rely upon the contents of the annual report as evidence of the fund's expenses. We turn now to the question of whether the fund is entitled to any deductions in excess of the $32,098.55 of printing expenses conceded by the Commissioner. As we have already stated, the fund bears the burden of proving that it incurred expenses and that such expenses are deductible *23 under section 512(a). While the fund claims to have adequately substantiated all of its deductions through trial testimony, its basic argument appears to be a request for treatment under the rule of Cohan v. Commissioner,39 F.2d 540, 543-544 (2d Cir. 1930), affg. in part and modifying in part, and remanding on this issue, 11 B.T.A. 743 (1928). Basically, the fund argues that it should be permitted the deductions claimed on its return because it could not have published "CORE Magazine," the inserts, and the "Equal Opportunity *610 Employment Journal" without incurring expenses. In Cohan, the taxpayer, a theatrical manager and producer, was obliged to incur substantial entertainment expenses in carrying on his business. The Second Circuit held that he was entitled to some deduction, even though he had not and "probably could not" substantiate the exact amount of such expenses, because this Court had found that he had spent substantial sums for entertainment and that these expenses were allowable deductions. Since only the amount of such expenses was in doubt, we were directed to make as close an approximation as we could, bearing heavily if we chose "upon the taxpayer whose inexactitude is of his own making." 39 F.2d at 544. Thus, in that case, the court was convinced that some deductible expenses were incurred. Although we are certain that the fund incurred some expenses, we cannot apply the Cohan rule where the record provides no satisfactory basis for estimating the amount of *24 a particular expense or for determining that a particular expenditure is in fact deductible. Williams v. United States,245 F.2d 559, 560 (5th Cir. 1957); Luman v. Commissioner,79 T.C. 846, 859 (1982); Epp v. Commissioner,78 T.C. 801, 807 (1982); *611 Schooler v. Commissioner,68 T.C. 867, 871 (1977). The fund's burden of proof extends beyond merely showing that it actually incurred expenses during the period in issue; it must also show that such expenses were deductible business expenses under section 162 or 167, and most importantly, that such expenses were "directly connected with" the fund's unrelated advertising activity. However, the record with respect to each of the deductions claimed by the fund ranges from weak to nonexistent with regard to one or all of these required elements of proof. There is no evidence at all in the record with respect to the fund's claimed deductions for depreciation, supplies, travel, conferences and conventions, building maintenance, and membership dues and subscriptions. Therefore, such deductions are disallowed for complete failure of proof. The only evidence of record with respect to the fund's claimed deductions for salaries and wages, rent, postage and shipping, rental and maintenance of equipment, materials, utilities, advertising and sales promotion, insurance, security, bad debt, office expense, and miscellaneous *25 expenses is the testimony of Mr. Innis. [8] *613 Although Mr. Innis's testimony *612 was not evasive, it was insufficiently specific to be of help to the fund. Despite the fact that he headed both CORE and the fund, Mr. Innis could testify about the deductions listed above in only a very vague manner due to a lack of knowledge. His general response when questioned by the fund's attorney on any of the expenses in issue was that an expense of the type claimed was incurred in publishing the magazine and that the amount claimed on the return "seemed reasonable"; he generally gave no details indicating a personal knowledge of the amount spent, exactly what it was spent for, or most importantly, how it was related to the magazine's publication. For example, with respect to the fund's deduction of $96,017 for salaries and wages, Mr. Innis testified that "$100,000 or so" in salaries for the 7-month period "seems reasonable." Although he stated that "over a dozen people" were involved in the publishing activity and that "the overwhelming majority" of the staff were employed fulltime, he could not be more precise as to all of their names, *26 hours, or salaries. Not even an "average" salary figure was provided. Such testimony is wholly inadequate to provide a basis for even an estimate of the salary expense actually incurred by the fund. Similarly, Mr. Innis's explanation of the fund's deduction of $11,921 for rent was that the rent was for the New York City office which the fund shared with CORE and that it was a large office with four or five rooms. However, he could not give "the precise rental, but the figures [sic] in here which is close to $12,000 seems to be reasonable." This testimony reflects not only a lack of knowledge as to the total rent actually paid, but more importantly, fails to show whether all or just a portion *614 of the total rent paid by the fund way attributed to its publishing activities. The New York office was used for several fund programs and was also CORE's national headquarters. Clearly, not all of the rent paid for the office was properly allocable to the fund's unrelated advertising income: yet, neither the testimony of Mr. Innis nor the testimony of Mr. Stewart, a director of Ross, Stewart, reveals whether rent was accounted for as a direct expense (with the total rent attributed to the advertising activity) or as an indirect expense, allocated among the several activities conducted in the office. Furthermore, even if we knew that rent was allocated among activities, the record contains no details of the method of allocation *27 other than that it was based upon the percentage of time which fund employees devoted to the magazine-publishing activities; the fund has not revealed the names of the employees or the percentage used in allocating any of its overhead expenses. It is impossible to make the allocation required by section 1.512(a)-1(c) of the regulations on such meager evidence.A deduction cannot stand on so flimsy a foundation; the allowance of any deduction for rent would *615 be speculative, amounting to "unguided largesse." Williams v. United States,245 F.2d at 560; Luman v. Commissioner,79 T.C. at 859; Epp v. Commissioner,78 T.C. at 807. That the fund has found it difficult or even impossible to prove the material facts upon which the right to the claimed expense deductions depends "simply leaves the claimant upon whom the burden rests with an unenforcible claim, a misfortune to be borne by * * * [it], as it must be borne in other cases, as the result of a failure of proof." Burnet v. Houston,283 U.S. 223, 228 (1931). While we are somewhat sympathetic with the plight of the fund, we observe that its plight is solely of its own making. The fund is a tax-exempt organization, soliciting contributions and advertising from the public. As such, it has an obligation under the Federal internal revenue laws to maintain adequate books and records; yet, it failed to do so. It further failed to produce the original documents evidencing its expenses when requested by the Commissioner's revenue agent *28 and when ordered to do so by this Court. At trial, the fund was barred from presenting such documents as a sanction for its uncooperativeness. That order, in *616 no way, prevented the fund from producing the reguired documentation earlier, during the examination by the agent of the IRS or in response to the discovery request. Therefore, we hold that the fund has failed to carry its burden of proof with respect to any portion of its claimed deductions for salaries and wages and for rent. Because the evidence is even more meager with respect to the fund's claimed expenses for postage and shipping, rental and maintenance of equipment, materials, utilities, advertising and sales promotion, insurance, security, bad debt, office expenses, and miscellaneous expenses, we further hold that the fund is entitled to no deduction with respect to those expenses. The record is sufficiently developed to permit the fund some allowance for legal and accounting fees and telephone expenses in calculating its unrelated business taxable income. The fund has claimed a deduction of $64,481 for professional fees for legal, accounting, and printing expenses, without specifying the portion of such deduction attributable to each of the three expenses. The Commissioner has conceded on brief that the fund is entitled to a deduction of $32,098.55 for the expense of printing *617 "CORE Magazine," the inserts, and the "Equal Opportunity *29 Employment Journal." These expenses were clearly evidenced by invoices produced by Mr. Karr, the president of the fund's printer, Karr Graphics, at trial. Mr. Karr also produced invoices for other printing jobs for which Karr Graphics billed CORE (not the fund), such as the printing of envelopes, letterhead paper, invoices, and the book "Profiles in Black." Neither Mr. Karr's testimony nor the invoices themselves establish whether any portion of such other printing work was directly connected with the solicitation of advertising or the production and distribution of the magazines. Consequently, we are unable to find that the fund has substantiated any printing expenses beyond those conceded by the Commissioner. However, the fund is entitled to a deduction for legal and accounting expenses incurred during the period in question. Attorney David Rozenholc was employed by CORE during the period in issue to assist it in several legal matters. Mr. Rozenholc billed CORE for $600 for two separate incidents in which he represented two CORE members or employees in criminal matters. Neither of such criminal matters related in any way *618 to the fund's advertising activity, and therefore, the $600 fee is not deductible by the fund. Mr. Rozenholc also billed CORE during the period in issue for $12,000, reflecting 300 hours at $40 per hour. This bulk bill covered other work which he performed for *30 CORE, including the defense of a "squatter" proceeding brought against CORE by the landlord of the New York office shared by CORE and the fund, and the defense of a suit brought against CORE and its officers by the New Jersey Attorney General. Mr. Rozenholc estimated that he devoted about 90 percent of his time to these two matters, and that, as between them he expended somewhat less than 40 percent of the time on the "squatter" proceeding. Both of these legal matters are directly connected with the fund's unrelated advertising activity; the New Jersey litigation involved allegations of improper solicitation of the advertising, and the "squatter" proceeding involved the office in which the fund published the magazines and conducted the telephone solicitation of advertising. The legal fees incurred in defending the New Jersey suit are an ordinary and necessary business expense under section 162. Cf. Commissioner v. Heininger,320 U.S. 467 (1943). *619 Bearing heavily upon the fund, we conclude that the fund is entitled to a deduction of $6,480 for such expenses. Cohan v. Commissioner,supra.However, the record does not contain information sufficient for us to determine the primary purpose of the "squatter" proceeding, i.e., whether or not it was to perfect or defend the fund's leasehold interest in the New York office. Consequently, we cannot allow a deduction for any of the legal fees incurred in the defense of such litigation because we cannot conclude that such *31 expenses were a currently deductible expense (cf. Industrial Aggregate Co. v. United States,284 F.2d 639, 647-649 (8th Cir. 1960)), rather than a nondeductible capital expenditure (cf. Bush Terminal Bldgs. Co. v. Commissioner,204 F.2d 575, 578 (2d Cir. 1953), affg. 17 T.C. 485 (1951); Shipp v. Commissioner,217 F.2d 401, 402 (9th Cir. 1954), affg. a Memorandum Opinion of this Court). Ross, Stewart billed CORE and the fund $7,200 for accounting and auditing services during the period. These accounting and auditing fees are an ordinary and necessary business expense deductible under section 162(a). See Malone & Hyde, Inc. v. United States,568 F.2d 474, 478 (6th Cir. 1978); *620 Arc Realty Co. v. Commissioner,34 T.C. 484, 495-496 (1960), affd. in part and revd. in part, on another issue, 295 F.2d 98 (8th Cir. 1961). However, neither the bill itself nor the testimony of Mr. Stewart or Mr. Innis indicates the portion of such amount that is "directly connected with" the fund's unrelated advertising activity. We find that $1,300 of such amount is deductible by the fund in computing its unrelated business taxable income under the Cohan rule. Finally, the fund claimed a deduction of $155,896 for telephone services. The only evidence in support of the deduction is Mr. Innis's testimony. However, with respect to this item of expenditure, Mr. Innis's testimony was more specific than it was as to the other deductions claimed by *32 the fund. He testified that the fund spent close to $1 million a year for telephone service for all of its activities, and that the fund solicited over 95 percent of its advertising over the telephone. The fund also solicited contributions by telephone, but Mr. Innis did not specify the portion of the fund's total telephone bill which is "directly connected with" the fund's unrelated advertising activity rather than with the solicitation *621 of contributions or the conduct of one of its other programs. Mr. Innis's testimony of a $1 million per year telephone bill is credible in light of the fact that the fund generated $2,282,747 in 7 months, nearly all of which amount was raised through the telephone solicitation of advertising and contributions. It is also undeniable that a portion of such telephone expense is deductible as a direct expense incurred in raising the fund's unrelated advertising income. Therefore, we conclude that the fund is entitled to deduct $103,200 for telephone expenses. Decision will be entered under Rule 155.
Footnotes
1. All statutory references are to the Internal Revenue Code of 1954 as in effect during the year in issue.↩
2. The annual report does not specify the portion of a program's total expenses allocable to each of the various activities included within such program.↩
3. All references to a Rule are to the Tax Court Rules of Practice and Procedure.↩
4. For purposes of computing unrelated business taxable income, both gross income and deductions are computed with certain modifications described in sec. 512(b); the only one of such modifications relevant in the present case is the "specific deduction" of $1,000 allowable to the fund under sec. 512(b)(12)↩.
5. Generally, the regulations provide that where the editorial or readership content of a periodical furthers the organization's exempt purpose, the costs of producing and distributing such readership content (the readership costs) qualify as costs "directly connected with" the unrelated advertising activity and are deductible from unrelated advertising income, but only to the extent that such readership costs exceed the income attributable to the readership content (the circulation income), and only to the extent that the deduction of such readership costs, after the deduction of direct advertising costs, does not result in a loss. Sec. 1.512(a)-1(d), (f), Income Tax Regs.↩; see generally, J. Galloway, The Unrelated Business Income Tax, ch. 5.3 (1982); B. Hopkins, The Law of Tax-Exempt Organizations, sec. 41.5 (4th ed. 1983). 6. It may be observed that the fund did in fact purport to apply sec. 1.512(a)-1(d) and (f), Income Tax Regs.↩, in preparing its tax returns. The fund's Form 990 states that its "direct advertising expenses" (in actuality, total periodical costs) exceeded its advertising income by $26,762. However, on its Form 990-T, the fund did not claim a loss from its unrelated advertising activity; rather, in accordance with the advertising regulations, the fund stated that it had neither a profit nor a loss for the period in question.
7. Although the fund has also stated on brief that the Commissioner's disallowance of all deductions was "unreasonable and arbitrary," the fund has consistently acknowledged that the burden of proof rests on it and has not contended that the burden of going forward with the evidence should shift to the Commissioner. Consequently, we adhere to the general rule that this Court will not look behind a deficiency notice to examine the evidence used or the propriety of the Commissioner's motives or the administrative policy or procedure involved in making his determinations. A trial before the Tax Court is a proceeding de novo; our determination as to the petitioner's tax liability must be based on the merits of the case and not on any previous record developed at the administrative level. See Greenberg's Express, Inc. v. Commissioner,62 T.C. 324, 327↩ (1974), and the cases cited therein.
8. The fund maintains that the testimony of Robert Stewart also substantiated the deductions in issue. Mr. Stewart was a shareholder in and the tax director of the fund's accounting firm at the time of that firm's audit of the books and records of CORE and the fund for the period in issue. He testified to Ross, Stewart's typical auditing procedures but was unable to give specific information on the firm's audit of CORE and the fund because he took no part in the audit. Therefore, Mr. Stewart was incompetent to testify to the specific facts underlying the fund's claimed deductions, and in fact, his testimony contains no such information.